# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MARK D. STEPHENS and LYNN STEPHENS, | No. 60051-0-II |
| Appellants, | |
| v. | |
| TOWN OF STEILACOOM, a municipal corporation, | ORDER GRANTING MOTION TO PUBLISH |
| Respondent. | |

Respondent, Town of Steilacoom, moves this court to publish its October 14, 2025 opinion. After consideration, we grant the motion. It is

ORDERED that the final paragraph in the opinion that reads, "A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered." is deleted. It is further

ORDERED that the opinion will now be published.

Panel: Jj. Glasgow, Cruser, Veljacic

FOR THE COURT:

_____
Veljacic, A.C.J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MARK D. STEPHENS and LYNN STEPHENS, | No. 60051-0-II |
| Appellants, | |
| v. | |
| TOWN OF STEILACOOM, a municipal corporation, | UNPUBLISHED OPINION |
| Respondent. | |

VELJACIC, J. — Mark and Lynn Stephens (the Stephens) appeal the trial court's entry of summary judgment in favor of the Town of Steilacoom (Town). The Stephens argue that the court erred in dismissing their inverse condemnation and related tort claims. Because the Stephens' inverse condemnation claim is barred by the subsequent purchaser doctrine, and their related tort claims are subsumed, we affirm and deny their request for attorney fees on appeal.

FACTS

I.      THE HISTORY OF THE STEPHENS' PROPERTY

The Stephens own three adjacent parcels in the Town of Steilacoom.



Clerk's Papers (CP) at 146.  The parcels at issue, highlighted in blue, include lots 17, 18, and 19

(collectively referred to as the Stephens' property).  A ditch runs along the southern border of lot

17 and 18 and continues northeast around the parcels. The parties dispute the history of the ditch and whether it is the product of a longstanding, regulated wetland.

The earliest evidence of the ditch is from 1971. That year, the local school district began construction on Saltar's Point Elementary, which is south of the Stephens' property. Construction plans of the school show that the ditch (also referred to as waterway) was to be "retained." CP at 61.



CP at 61. The Stephens maintain that the construction plans do not "show water flowing from the construction site to the Stephens['] property." Br. of Appellant at 6.

In 1998, the local school district redeveloped a parking lot at the elementary school. The ditch could also be seen in the redevelopment plans.





N

CP at 62. The parking lot was completed in 2002.

In 2010, Joey Hollow, a development company constructing a nearby subdivision, submitted a storm drainage and wetland hydrology report to the Town. Joey Hollow explained that it would install a new bioswale, which would be located south of the Stephens' property. The new bioswale would collect runoff water not captured by other flow control measures. The Town approved the plans in 2013 and the bioswale was completed in 2014. The Stephens argue that this construction resulted in "significant seasonal saturation of water" on their property, resulting in wetland characteristics, because it redirected runoff from other areas.[1]

In 2013, the Town also issued a stormwater comprehensive plan. In the plan, the Town outlined several projects, including a project that would replace a 12-inch pipe along Beech Street. The Town wanted to replace the pipe to "correct a deficiency identified by the hydraulic model" in the area. CP at 432. The pipe ran along the southern border of the Stephens' property. The parties dispute when the pipe was originally installed.

---

[1] The Stephens do not point to any conduct that occurred *after* they purchased the property in 2018 that resulted in alleged wetland characteristics on the property.

II.    THE STEPHENS' ACQUISITION OF THE PROPERTY

The Stephens purchased lots 17 and 18 in late 2018.  The Stephens paid $75,000 for each parcel, which they believed to be fair market value.

Prior to purchasing lots 17 and 18, the Stephens inspected the property.  The Stephens "did not observe any water running through the ditch."  CP at 146.  But the Stephens did recognize that the property was "covered [with] sticker bushes, trees, and other thick vegetation."  CP at 146-47.

There was no documentation filed with the local county auditor's office about the Stephens' property being a regulated wetland, nor was there any information related to the construction projects for the elementary school and the Joey Hollow subdivision.  The prior owners also did not disclose the existence of a wetland in a disclosure statement.

The previous owners did, however, provide the Stephens with a wetland reconnaissance and verification report for lots 17 and 18 that was completed in 2010 (Comis Report).  The Comis Report explained that "[w]etland areas were identified" on the property.  CP at 84.  The report made this determination based on the current "Washington State Wetlands Identification and Delineation Manual for Western Washington."  CP at 84 (emphasis omitted).[2]  The report also noted that "[t]he Pierce County [Geographic Information System (GIS)]  Map for [the] area show[ed] possible wetlands in the onsite and adjacent offsite areas."  CP at 85.  The report also indicated that the area had an "Ordinary High Water Mark (OHWM) along an Unnamed Tributary, which extends along the eastern side of [the property], and appears to flow to the north into an identified stream that continues flowing north toward the Puget Sound."  CP at 85 (internal quotation marks omitted) (emphasis omitted).  A figure detailing the report's findings is as follows:

_____

[2] A report commissioned by an owner of an adjoining parcel to the Stephens' property in 2000 also concluded that a wetland was present on the property.  The report did not reference the Stephens' property.

6



CP at 88. The report noted that it did "not include a detailed delineation of wetland boundaries."

CP at 84 (emphasis omitted).

III.     FACTS LEADING TO THE STEPHENS' LAWSUIT

Following the purchase of the two parcels, the Stephens obtained a limited clearing permit

in October 2018. Because the parcels were "so heavily vegetated, [the Stephens] needed to remove

brush from the corners" of the property. CP at 67. In addition to clearing out all vegetation on the

parcels, the Stephens began to truck in fill dirt. The Stephens "did not disturb the areas of vegetation along the [bioswale]." CP at 149.

A resident in the area notified the Town of the Stephens' actions. After receiving a report detailing the violation, the Town issued a stop work order in January 2019, noting that the Stephens were violating the municipal code by clearing a regulated wetland. The Army Corps of Engineers (Corps) also sent a cease-and-desist letter to the Stephens, explaining that they "discharged fill in a wetland." CP at 401.[3] The Town explained that to get rid of the stop work order, the Stephens had to "prepare a critical areas report . . . and a restoration plan." CP at 96.

After receiving the stop work order, the Stephens commissioned additional studies showing that the wetlands on the property were not naturally sustaining. Instead, reports concluded that the wetland characteristics on the property were attributable to construction in the surrounding area that directed runoff water onto the Stephens' property.

Despite the Stephens' existing issues with lots 17 and 18, they purchased another parcel in October 2019. Both the Town and the Department of Ecology provided the Stephens with alternative pathways for developing the property, such as obtaining wetland permits, stormwater permits, or disputing the jurisdiction over the wetland, but the Stephens did not pursue these avenues. The Stephens also did not file an administrative challenge to the stop work order or the determination that the property qualified as a regulated wetland.

---

[3] The Stephens argue that the "wetland characteristics on the property were artificially created by the Town," which they say was significant because "[b]oth the [Town] and the Washington State Department of Ecology do not consider artificially created wetlands to be subject to their regulations." Br. of Appellant at 10, 12.

IV.    THE STEPHENS' LAWSUIT AGAINST THE TOWN

The Stephens filed suit against the Town in June 2022 in the Superior Court for Pierce County. The Stephens pursued six causes of action, including: (1) quiet title, (2) injunctive relief, (3) trespass, (4) nuisance, (5) inverse condemnation, and (6) a substantive due process violation under 42 U.S.C. § 1983. The Town removed the action to the federal district court for the Western District of Washington. There, both parties moved for summary judgment. The district court granted the Town's motion for summary judgment, in part, dismissing the Stephens' quiet title and § 1983 claims (numbers (1) and (6) respectively). The court did not exercise supplemental jurisdiction over the remaining state law claims: nuisance, intentional trespass, inverse condemnation, and injunctive relief (numbers (2)-(5)), and stayed any federal takings claim.

After remand to the Pierce County Superior Court, the parties again moved for summary judgment. The Town maintained that the Stephens' claims were barred by the subsequent purchaser doctrine. The Town argued that "all of the purported conduct—all of the theories of what caused this wetland to form—even if true, . . . happened before 2018, when [the Stephens] bought the property." Rep. of Proc. (RP) at 4-5. As a result, the Town argued, the Stephens could not pursue an inverse condemnation claim. And the Town emphasized that the Stephens were on notice that the property was burdened by a wetland because of the Comis Report provided by the previous owners in addition to the characteristics of the property itself such as the presence and type of vegetation on the property.

In response, the Stephens pointed to the fact that there were no "public records" in the county auditor's office about the Stephens' property being a regulated wetland. The Stephens did, however, acknowledge that they received the Comis Report from the previous owners. The Stephens also acknowledged that they received documents related to the construction projects

around their property during discovery. And the Stephens argued that the runoff was only recently redirected toward their property, which suggested that the Town was attempting to co-opt the two parcels "into a public surface water repository." RP at 14.

When discussing the Stephens' knowledge of the property exhibiting wetland characteristics, this exchange took place:

> [Plaintiff's Counsel:] My client—we admit, he had a Comis Report that was not an actual official delineation of wetlands but did have language about a wetland, but we're not talking about a wetland in this case; we're talking about an artificial town-made water surface system that is not the natural water flow. It is—they put in pipes; they put in bioswales. [The Town has] done all these things that are artificial which makes it not actually a wetland under our state and federal regulations.
>
> [The Court:] Wait. I just want to make sure I understand what you are saying. You are saying that your client had a document prior to purchase that indicated there were wetlands on the property, but you're now saying they really weren't wetlands except to the extent that the town took further action?. . . .
>
> [Plaintiff's Counsel:] There were no wetlands on the property before my clients bought it. . . .
>
> [The Court:] So we do have in various aspects of the law this kind of duty to inquire. So I guess my question to you is when—even accepting your arguments here—when your client gets information that indicates—let's just use the word "may"—may be wetlands on the property—is there not now a duty to inquire as to "I've got to take this information; I can't ignore the information I've been provided; I have a duty to inquire to figure out what's going on?". . . .
>
> [Plaintiff's Counsel:] I'm not aware of a legal duty to inquire on that situation, no.

RP at 15-17.

Ultimately, the court did not rule on the parties' motions at the hearing because it needed to review relevant case law and the parties' submissions. The court later granted the Town's motion and dismissed the Stephens' remaining claims.

The Stephens appeal.

ANALYSIS

I.    THE COURT DID NOT ERR IN DISMISSING THE STEPHENS' INVERSE CONDEMNATION CLAIM AND RELATED TORT CAUSES OF ACTION

The Stephens argue that the trial court erred in granting summary judgment on the basis that their inverse condemnation claim was barred by the subsequent purchaser doctrine. They also argue that the trial court erred in dismissing their related tort actions. We disagree and affirm the dismissal of their claims.

We review orders granting summary judgment de novo, "'engag[ing] in the same inquiry as the trial court.'" *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 140, 331 P.3d 40 (2014) (internal quotation marks omitted) (quoting *Ellis v. City of Seattle*, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000)). "A court may grant summary judgment if the pleadings, affidavits, and depositions establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000); CR 56(c). A material fact is a "'fact upon which the outcome of the litigation depends, in whole or in part.'" *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979) (quoting *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974)). We view all submitted facts and reasonable inferences in the light most favorable to the nonmoving party. *Hunt*, 181 Wn.2d at 140.

A.    Inverse Condemnation

Under the Washington State Constitution, the State may not take or damage private property for public use without just compensation. WASH. CONST. art. I, § 16. An inverse condemnation action is available to allege "a governmental 'taking' or 'damaging' that is brought to recover the value of property which has been appropriated in fact, but with no formal exercise of the power of eminent domain." *Dickgieser v. State*, 153 Wn.2d 530, 534-35, 105 P.3d 26

(2005). To succeed in an inverse condemnation action, a plaintiff must prove "'(1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings.'" *Fitzpatrick v. Okanogan County*, 169 Wn.2d 598, 606, 238 P.3d 1129 (2010) (quoting *Dickgieser*, 153 Wn.2d at 535).

As with pursuing any legal claim, a plaintiff must have standing to pursue recovery through inverse condemnation. *See Maslonka v. Pub. Util. Dist. No. 1 of Pend Orielle County*, 1 Wn.3d 815, 826, 533 P.3d 400 (2023) ("If a plaintiff lacks standing, the court need not hear the case."). The subsequent purchaser doctrine prohibits a subsequent purchaser "from asserting the legal rights of the owner at the time of the alleged taking." *Id.* at 827. In other words, "'a grantee or purchaser cannot sue for a taking or injury *occurring prior to his acquisition of title*, but he may sue for any new taking or injury.'" *Hoover v. Pierce County*, 79 Wn. App. 427, 433, 903 P.2d 464 (1995) (internal quotation marks omitted) (emphasis added) (quoting *State v. Sherill*, 13 Wn. App. 250, 257 n.1, 534 P.2d 598 (1975)), *abrogated on other grounds by Arkansas Game & Fish Com'n v. United States*, 568 U.S. 23, 133 S. Ct. 511, 184 L. Ed. 2d 417 (2012).

"A new taking occurs when additional governmental action causes a measurable decline in market value of the property." *Maslonka*, 1 Wn.3d at 828. Therefore, the doctrine requires the plaintiff to "demonstrate that they are the proper party to invoke judicial resolution of the dispute," meaning that the taking and/or damage occurred while the plaintiff owned the property. *Id.* at 826. Otherwise, the plaintiff lacks standing, and they cannot pursue the claim. *Id.*

The doctrine ultimately aims to prevent a subsequent purchaser from both enjoying the benefit of a reduced purchase price reflective of a taking and also benefitting again by recovering damages from suit for same diminished value reflected in their discounted purchase price. *See Hoover*, 79 Wn. App. at 433-34. In doing so, the doctrine operates under the assumption that the

subsequent purchaser acquired the property at a diminished value as a result of the alleged taking and/or damage. *See Maslonka*, 1 Wn.3d at 828. Because of this, the subsequent purchaser cannot pursue an inverse condemnation "unless [the claim is] expressly conveyed." *Hoover*, 79 Wn. App. at 433-34.

In *Maslonka*, the Maslonkas pursued an inverse condemnation claim after a dam operated by the Pend Orielle Public Utility District (PUD) caused flooding on their property. 1 Wn.3d at 818. The dam was built in 1955, and the Maslonkas purchased their property in 1993. *Id.* at 817. Prior to acquiring the property, the previous owners notified the Maslonkas "that the lower part of the river flooded periodically, in 'abnormally wet years or high water years.'" *Id.* at 821. The previous owners also "sold express easements to the PUD," allowing "the PUD to intermittently or continuously overflow, flood and submerge, or to damage by wash, erosion, sloughage, seepage, inundation, or other cause,' the land with water from the river in the construction, operation, and maintenance of the dam." *Id.* (internal quotation marks omitted). Based on the erosion of the shoreline that went beyond the scope of the easements, the Maslonkas pursued recovery through inverse condemnation and other tort related claims. *Id.*

Our Supreme Court concluded that the Maslonkas lacked standing because they were subsequent purchasers. *Id.* at 828. The court recognized that the dam was built in 1955, long before the Maslonkas purchased the property. *Id.* As a result, it was "the Sullivans, who owned the land at the time [of the taking]," who were the proper plaintiffs to bring an inverse condemnation action. *Id.* The court explained that "[i]mplicit in the subsequent purchaser [doctrine] is the principle that the purchase price of the land subject to a governmental taking *reflects the diminution of value*." *Id.* (emphasis added). Because of this, the court *assumed* that "the Maslonkas' purchase price reflected [the] known seasonal flooding." *Id.* The Supreme Court

13

did not require an analysis of notice, actual knowledge, or constructive knowledge as a prerequisite to applying the subsequent purchaser doctrine. *Id.*

Additionally, the court determined that the Maslonkas could not establish that there was a new taking since they had acquired the property in 1993, which would have given them standing to sue for inverse condemnation. *Id.* at 828. The court noted that there was no evidence in the record to support that "the dam's operations changed after 1993 to increase flooding." *Id.* at 829 (emphasis omitted).

Here, the Stephens similarly lack standing to bring an inverse condemnation claim. The evidence presented by the Stephens shows that all alleged conduct by the Town occurred *before* the Stephens purchased the property in 2018. Moreover, wetland conditions, whether natural or the product of human conduct, predated the Stephens' purchase of the property. Therefore, the Stephens could not have standing. And like *Maslonka*, the Stephens were made aware of the condition prior to purchase. 1 Wn.3d at 821 (noting that the Maslonkas talked with the previous owners about the property periodically flooding). The Stephens acknowledged that they received the Comis Report from the sellers, which identified that there were wetlands on the property. Like *Maslonka*, we assume that the Stephens' purchase price of the property did *or should have* reflected the diminution of value as a result of wetlands burdening the parcels. *Id.* at 828.

To avoid dismissal of their inverse condemnation action, the Stephens must establish that a new taking occurred *after* they purchased the property. *Id.*. The Stephens do not raise a material issue of fact such that a rational trier of fact could conclude that a new taking occurred *after* they

purchased the property.[4, 5]   The Stephens also fail to show that they were assigned the inverse condemnation cause of action against the Town from the prior owners.

The Stephens make a number of arguments that do not compel a different result.  First, the Stephens claim that they could only have notice of the condition if there was formal documentation of the construction and/or wetland in the county auditor's office, even though they had the Comis Report prior to purchasing the property.  But notice related to an interest in property is immaterial to the subsequent purchaser doctrine, *see Maslonka*, 1 Wn.3d at 828, so this argument fails.

Second, the Stephens rely on the latent condition exception, arguing that they did not have knowledge of any condition burdening the property.  Because of this, the Stephens assert that they should be able to pursue an inverse condemnation action even though the condition existed before they purchased the property.  As they correctly observe, no court in Washington has recognized such an exception.  The Stephens, however, cite to *Pacific Highway Park. LLC v. Department of*

---

[4] The Stephens point to the appraisal report which reflected that parcels 17 and 18 were valued at $4,000 each when considering that the property is burdened by a regulated wetland.  While in the light most favorable to the Stephens, the reduction in the value of the property became apparent to the Stephens after they purchased the property, all of the alleged actions and/or conditions that caused the decrease in market value occurred before they came into ownership.  Their post-purchase valuation does not compel a different result on the standing issue.

[5] The Stephens argue that the determination of "[w]hether the Town's artificial channeling of water constitutes a taking is central to [their] inverse condemnation claims."  Br. of Appellant at 18.  But even if we were to assume the Stephens were correct, their claim would still fail on the grounds that all alleged conduct and conditions existed *before* they acquired the property—putting them squarely within the scope of the subsequent purchaser doctrine.

The Stephens also argue that they were never on notice that a *regulated* wetland existed on their property.  But whether the Stephens fail to establish that a regulated/not regulated distinction exists under state law, and whether the wetland is regulated are immaterial to the standing question.  What is material is whether any taking activity and resulting condition existed prior to their purchase such that their purchase price is assumed to reflect the diminution in value from the taking.

*Transportation*,[6] an unpublished decision from this court, for support. There, we referenced the doctrine to address a party's argument, but we declined to recognize that the exception applied in this context because it was unnecessary under the facts of the case. *Id.* slip op. at 8. We decline to recognize such an exception here, remaining faithful, instead, to the analysis that the Washington Supreme Court recently applied in *Maslonka*.

Therefore, we conclude that when viewing the facts in the light most favorable to the Stephens, there are no genuine issues of material fact that preclude summary judgment. As subsequent purchasers, the Stephens lacked standing to bring an inverse condemnation claim, so their claim fails.

B.      Related Tort Claims

When an inverse condemnation claim is available to a plaintiff, related tort actions are subsumed. *Highline School Dist. No. 401 v. Port of Seattle*, 87 Wn.2d 6, 17-18, 548 P.2d 1085 (1976); *Maslonka*, 1 Wn.3d at 830-31. The subsummation of a tort claim *is not dependent on the success of a plaintiff's inverse condemnation claim. See Maslonka*, 1 Wn.3d at 830-31. Rather, related tort claims are subsumed when (1) the defendant is an entity to which eminent domain principles apply, and (2) the plaintiffs seek damages for a loss of property rights (damage and/or taking). *Id.* This is so because "[i]f tort claims exist[ed] as a backup theory of recovery for otherwise barred inverse condemnation claims, subsequent purchasers could endlessly sue governmental entities in tort." *Id.* at 833. While related tort claims are barred, a plaintiff may pursue recovery for damages unrelated to the loss of property rights. *See id.*

---

[6]   No.   44198-5-II,   (Wash.   Ct.   App.   June   3,   2014)   (unpublished), http://www.courts.wa.gov/opinions/.

Here, the Stephens' related tort actions are subsumed by their inverse condemnation claim. Along with their inverse condemnation claim, the Stephens pursued tort recovery under the theories of trespass and nuisance, both of which were premised on the loss of property rights. Again, this case is like *Maslonka*. There, our Supreme Court reasoned that the Maslonkas could not pursue alternative tort recovery. *Id.* at 830-32. This conclusion was based on the fact that the Maslonkas' claim was based on the argument that a taking had occurred, but the Maslonkas were ultimately barred from relief because of the subsequent purchaser doctrine and lacked standing. *Id.* at 831.

Like *Maslonka*, this case implicates the Town, a government entity to which eminent domain principles apply. *Id.* at 831. And the Stephens are pursuing recovery for a loss of their property rights: the inability to construct a residential home without being burdened by the regulations applicable to a wetland as well as the decrease in market value of their property. *Id.* at 832. The Stephens chose the inverse condemnation avenue to pursue the alleged invasion of their property rights. Consequently, like in *Maslonka*, any related tort recovery is barred. *Id.* at 832. Any other outcome would allow the Stephens to attempt to recover for the same underlying conduct covered by an inverse condemnation claim, something Washington courts do not permit. *See id*.

Even if the remaining tort claims were not subsumed, the claims would still fail. First, the Stephens did not assign error to the court dismissing their tort claims on the merits. Moreover, the Stephens do not provide substantive argument in their opening brief regarding their tort claims. They do discuss their intentional trespass claim in their reply brief, but that is too late to warrant review. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992);

17

RAP 10.3(a), (c). At no point do they discuss their nuisance claim. Therefore, both claims are abandoned. RAP 10.3(a)(6).

Second, assuming the Stephens provided adequate argument regarding their intentional trespass claim, there is no evidence in the record illustrating that the Town intentionally caused water to be displaced onto the Stephens' property, so their claim would fail as a matter of law. *Hurley v. Port of Blakely Tree Farms L.P.*, 182 Wn. App. 753, 772, 332 P.3d 469 (2014) (explaining that to succeed in an intentional trespass claim, the plaintiff must establish, among other elements, that the defendant engaged in an intentional act). The only conduct that resulted in water being discharged on to the Stephens' property was the result of the school district and a private developer.

We conclude that there are no genuine issues of material fact that the Stephens' remaining tort claims are subsumed by the inverse condemnation claim as a matter of law. Therefore, the trial court did not err in dismissing the Stephens' remaining tort causes of action.[7]

II.    ATTORNEY FEES

Pursuant to RAP 18.1 and RCW 8.25.070, the Stephens request attorney fees on appeal. Because they are not the prevailing party on appeal, we decline to award attorney fees.

---

[7] The Stephens apparently make a claim for negligent permitting in their complaint. The Stephens, however, did not provide sufficient briefing on this issue, and we decline to address it further. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

CONCLUSION

Accordingly, we affirm the trial court's entry of summary judgment in favor of the Town and deny the Stephens' request for attorney fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Glasgow, J.

Cruser, C.J.