[No. 32098.   Department Two.   July 8, 1953.]

MIKE J. FEELEY, *Appellant,* v. E. R. BUTTERWORTH & SONS *et al., Respondents.*[1]

*Mark M. Litchman,* for appellant.

*Morris H. Russell, Gordon H. Sweany,* and *Wright & Wright,* for respondent E. R. Butterworth & Sons.

[1]Reported in 259 P. (2d) 393.

*Melvin T. Swanson* and *Jack E. Hullin,* for respondents Sargent and Matheny.

*Morrissey, Eagen & Hedrick,* for respondent Olson.

FINLEY, J.—Plaintiff appeals from a judgment of dismissal, entered in the superior court for King county, in his action instituted to recover damages. These were claimed to have resulted from a landslide, allegedly caused by defendants' acts, purportedly constituting a withdrawal of lateral support respecting plaintiff's land.

The relevant facts are: Plaintiff and the respondent Butterworth corporation owned adjoining lots in block two, replat of Twelfth avenue addition to the city of Seattle. The property line separating these adjoining lots runs generally north and south, thus forming the west boundary of the Feeley lot and the east boundary of the Butterworth lot. Prior to 1949, the lots were approximately on the same level. The Butterworth lot was vacant and unimproved, whereas on the Feeley lot there was an apartment building and a multiple-car garage. The garage was located on the southwest corner of the Feeley lot and was about sixteen feet wide by fifty feet long. The rear wall of the garage ran along parallel to the common property line for a distance of about fifty feet. The garage was built of unreinforced concrete, with a flat sloping roof made of tar and gravel. The garage had no floor. It rested on concrete footings placed about two feet in the ground.

In 1949, the Butterworth corporation wished to convert its unimproved property into a parking lot. Accordingly, the corporation entered into a contract with the defendants Grant E. Sargent and George Matheny, by which the latter were engaged to do the work. Sargent and Matheny, in turn, subcontracted the excavating work to H. Edwards and Kenneth Olson, d/b/a North Seattle Construction Company.

The excavation, which was carried on according to prepared plans and specifications, was commenced early in November, 1949, at which time there were heavy rains in the Seattle area. Prior to the actual excavation, soil tests were made to determine whether any substances, such as

blue clay or subterranean waters, conducive to soil slippage, were present. The soil was found to be of hardpan, gravel, and yellow clay, heavily compacted and resistant to sliding. (It also appears that the soil was retested after the excavation had progressed to some degree.) Excavation was done by the "swathing" method, *i.e.*, cutting swaths by removing earth in somewhat narrow strips across the full length of the lot.

By November 22, 1949, the excavation was completed. As completed, the crest of a slope or bank began some two feet west of the Feeley-Butterworth property line, thus being two feet from the rear wall of the Feeley garage. From the crest, the bank sloped downward for a short distance at a one-to-one slope, and then broke to a lesser slope. In general, the floor of the excavated lot was about seventeen feet lower than the level of the Feeley lot. Although it had been raining continuously in this area, no slides occurred during the period of excavation.

However, a few days later, on the morning of November 26th, a day when there was a heavy rainfall, Mr. Sargent made a routine check of the area. He noticed water seeping from the face of the slope and immediately got in touch with Mr. Detroit, an employee of the North Seattle Construction Company. Together, Mr. Detroit and Mr. Sargent entered on the Feeley lot to determine where the water was coming from. At the time, the only *apparent* source of water was from a downspout located at the southwest corner of the apartment house. This water, as it was discharged from the downspout, ran off as surface water into the garage, and through the garage onto the face of the slope or bank. Sargent and Detroit dug a trench to carry this surface water down to the lower level of the Butterworth lot. After the trench was built, a flume of tarpaper and lumber was built to carry off the surface water. These measures proved inadequate, and by five p. m. of the same day, the bank of the excavation along this joint property line gave way. There was a cave-in, which carried with it most of the plaintiff's garage.

Unknown to the respondents (and apparently unknown

to appellant), the area of the garage roof was drained by means of a drainpipe located on the inside of the garage. This drainpipe extended into the ground for some distance, close to the property line but on Feeley's side of it. At some distance under the ground, an elbow connection extended the pipe about five feet into the Butterworth lot, where it came to a dead end, without connecting to any sewer or other outlet. Before the collapse of the bank, the underground portions of the drainpipe were not visible to the respondents. Similarly, its existence was not disclosed by the excavation, since the end of the pipe lay back of the face of the slope and the excavating had not gone back far enough to uncover it.

As indicated above, plaintiff instituted an action to recover for damages resulting from an alleged deprivation of lateral support for his land. We shall not endeavor to detail the various answers and cross-pleadings entered by the respective defendants, since they are not in issue here. We note, however, that the tenor of the answering pleadings was that the plaintiff caused his own injury by unlawfully discharging surface waters into the bank, causing it to weaken and give way. After a trial of the case, the court made fact findings adverse to the plaintiff and dismissed the plaintiff's complaint, as well as the cross-complaint of one of the defendants.

Reduced to essentials, this appeal touches on two main issues: (a) the rules governing liability in a lateral support case, and (b) whether the trial court's fact findings are supported by the evidence.

Appellant Feeley contends that, since there has been a "taking" of property, within the meaning of Article I, § 16, of the state constitution, there is absolute liability on the part of the respondents, without considering the question of whether their excavation was done negligently (citing *Farnandis v. Great Northern R. Co.*, 41 Wash. 486, 84 Pac. 18; *Hummel v. Peterson*, 69 Wash. 143, 124 Pac. 400; *Knapp v. Siegley*, 120 Wash. 478, 208 Pac. 13; and *Muskatell v. Seattle*, 10 Wn. (2d) 221, 116 P. (2d) 363.) On the other hand, the respondents contend that this provision of the constitution

comes into play only when some governmental unit has taken land, and that here we have nothing more than the possibility of an alleged trespass between private parties. Thus, say the respondents, plaintiff must prove negligence before he can recover.

An analysis of the above authorities, which may tend to establish the plausibility of Feeley's contention, is, we believe, unnecessary because of the view we take of this case.

The point is that, although one might be absolutely liable for the removal of lateral support owed adjoining land in its natural condition, it must first be shown that, as a matter of fact, he has deprived another of lateral support. Furthermore, in view of the respondents' defense and the convincing showing that the appellant, by means of a concealed pipe, artificially discharged surface waters into the land of the Butterworth corporation, it is difficult for us to see how appellant Feeley can counter by showing that his own acts did not cause his injury.

On these issues, the trial court found, as a fact, that the excavation made by the defendants did not deprive the plaintiff of any lateral support; and found further that the sole cause of the collapse of the bank was due to plaintiff's discharging accumulated surface waters onto the land of the Butterworth corporation and by means of the concealed drainpipe into the unexcavated slope or bank which had been left as lateral support for plaintiff's land.

The only question, then, is whether we can say that these findings of the trial court are not supported by the evidence. Conversely, if they have support in the evidence, we will not overturn the findings of the trial court. *In re Dand's Estate,* 41 Wn. (2d) 158, 247 P. (2d) 1016.

We are of the opinion that the trial court did not err in making its findings. As to whether lateral support was ever deprived the plaintiff in the first instance, the evidence discloses that the excavating work was properly done, with due care for plaintiff's property rights; that the sloping portion left to support the plaintiff's land was adequate; that the slide occurred, or the bank was washed away, mainly by waters discharged from the concealed drainpipe; that the

soil was of a structure and composition not making it susceptible to sliding; that, despite the fact heavy rains fell throughout the period of excavation, no slides occurred during that period. However, these are not the only facts in the case which incline us toward affirmance of the trial court's findings. An even steeper adjoining slope, left by the excavation, did not cave in or give way. Furthermore, we note that the record also contains photographic evidence, taken shortly after the washout, which shows that the bulk of the washout occurred in the immediate area of the end of the drainpipe, and that other portions of the face of the slope remained intact, despite the fact they were subjected to the same rains.

Ultimately, the issue is one involving the factor of causation; that is, whether, in fact, the defendants deprived plaintiff of lateral support or whether the plaintiff's own acts caused his injury. As already indicated, the trial court found, as a fact, that injury was caused by the plaintiff's own acts.

While the plaintiff had a right to discharge surface waters by natural means—even though they were discharged onto the lands of another—he had no right to convey them to the defendant Butterworth's land by an artificial means, a concealed drainpipe. *Whiteside v. Benton County*, 114 Wash. 463, 195 Pac. 519; *D'Ambrosia v. Acme Packing & Provision Co.*, 179 Wash. 405, 37 P. (2d) 887.

In justification of this means of discharging the waters, the plaintiff contended that, at the time the garages were constructed, the custom in the building trade was to lead a drainpipe into a dry well located on vacant adjoining property. But, as this was in violation of a Seattle ordinance, we do not see how such practices could be justified. Plaintiff further contended that, since he did not know of the existence of the pipe (it appears he had acquired the property early in 1949), knowledge of its existence should not be imputed to him. This contention is without merit, for the plaintiff is the one who was in the best position to discover the existence of the drainpipe. Whether he should have anticipated that the drainpipe was not connected to a sewer

outlet, we need not and do not decide here. While appellant Feeley vigorously has protested that the findings of the trial court require clairvoyance and omniscience of him, we do not agree that such is the effect of the findings.

What we have said adequately treats of the various assignments of error. However, we shall comment briefly as to the second and eighth assignments of error. In the former, appellant Feeley contends the court erred in failing to find that no notice of the pending excavation had ever been given to him until just shortly before the bank collapsed. Relying on *Knapp v. Siegley, supra,* Feeley contends the failure to give notice is negligence. We are satisfied, after a reading of that case, that nothing therein makes the giving of notice mandatory. All we said in that case was that, under some circumstances, the giving of notice might be considered as an element in determining negligence.

Lastly, we shall discuss the error urged by appellant Feeley in his assignment No. 8, which reads as follows:

"8. Refusing to continue the trial at the close of the case by hurrying the plaintiff's counsel; in violating his promise to permit additional briefs before deciding the case at the end of the trial; in disregarding the motion for new trial completely and in treating a motion to reconsider as a motion for new trial in violation of the statutes and decisions."

With regard to this assignment of error, the facts are that the trial judge who heard the case was a visiting judge who had come to King county from Clallam county. At the end of the trial (about 3:40 p. m.), the plaintiff indicated that he would like a continuance in order to be able to meet the various arguments his five adversary counsel would make. The various counsel for the defendants indicated, on the other hand, that they intended to make only very short arguments, and that they wished the case would be decided while the evidence was still fresh in the mind of the court. The court denied the motion for continuance, and argument proceeded. It appears from one of the respondents' briefs that appellant's counsel argued for fifty minutes, presenting every aspect of his case but one. It also appears that, although the judge had indicated plaintiff's counsel would

have a chance to supplement arguments by submitting written briefs, an oral decision was rendered at the close of argument.

However, counsel got together, and, after considerable subsequent correspondence, it was agreed the case would be reargued. The day set for reargument was October 4, 1951. On that day, plaintiff's counsel filed a motion to reconsider the prior oral decision. This was treated as a motion for judgment notwithstanding the oral decision. Simultaneously, appellant's counsel filed a motion for a new trial, and it was agreed that argument would be considered in support of both the motion to reconsider and the motion for new trial. The case was then argued for three fourths of a day. Subsequently, the fact findings made in the case were entered.

After these fact findings were made, plaintiff again made a motion for new trial. An affidavit in support of the motion recited the facts with respect to the rulings the trial court made at the end of the case, and, as to a claim of newly discovered evidence, emphasized the existence of a custom in the Seattle area, at the time the Feeley garage was constructed, of draining surface waters by running them through a pipe into a dry well located on adjoining vacant property. The affidavit also recited the lack of knowledge on the plaintiff's part that the drainpipe led from the Feeley property to the Butterworth lot. The order of the trial court, ruling on this motion, shows that it was denied because all the matters presented therein had been twice argued before.

Before we will overrule the trial court for its refusal to grant a new trial on the ground of newly discovered evidence, we must be able to say that the trial court has manifestly abused its discretion. *Strong v. Sunset Copper Co.,* 9 Wn. (2d) 214, 114 P. (2d) 526, 135 A. L. R. 423; *Nelson v. West Coast Dairy Co.,* 5 Wn. (2d) 284, 105 P. (2d) 76, 130 A. L. R. 606. Considering that the case was twice argued, and considering that the only new evidence in support of the new trial was that of the alleged custom in the building trade (which custom would be inoperative in any event, as

it contravenes a Seattle ordinance), it cannot be said that the trial court erred.

The judgment of the trial court will be affirmed in all respects.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and DONWORTH, JJ., concur.

August 31, 1953. Petition for rehearing denied.

[1]Reported in 259 P. (2d) 398.