[No. 16954-1-II.    Division Two.    October 3, 1995.]

GALEN A. HOOVER, ET AL., *Respondents*, v. PIERCE
COUNTY, *Appellant.*

*John W. Ladenburg, Prosecuting Attorney*, and *Ronald
La Mar Williams, Deputy*, for appellant.

*Joseph F. Quinn, Harold T. Hartinger,* and *Vandeberg Johnson & Gandara,* for respondents.

FLEISHER, J. — The Hoovers instituted an inverse condemnation action against Pierce County, claiming that a county roadway diverted surface waters onto the Hoovers' property. The trial court ordered a directed verdict against the County, and the jury determined damages. The County appeals, arguing that the trial court erred in granting a directed verdict for the Hoovers, and in denying its motion for a directed verdict. We hold that the Hoovers may not recover damages based on inverse condemnation by the County because any taking by the County occurred before they purchased the property. Accordingly, we reverse.

## FACTS

In 1925, the residents of Horsehead Bay, west of Gig Harbor, petitioned the County to construct a road accessing their properties. The County completed construction of this road, Horsehead Bay Drive, in 1928. The road extends north for a quarter mile along Horsehead Bay, and terminates just south of property now owned by the plaintiffs, Galen and Patricia Hoover.

The Hoovers' property consists of three lots located adjacent to one another. The Hoovers purchased the southernmost lot, located closest to the county road, in 1956. They purchased the northern two lots in 1988 from Marcella Kester for $265,000. Kester had owned the lots since 1950, living in a home on one lot and renting a home on the other lot.

Horsehead Bay Drive gradually slopes downhill, with the low point located at the end of the county right-of-

way. In 1972, a culvert was installed at this low point to allow draining water to flow under the roadway. Water from a nine-acre drainage area would naturally flow across the low areas of the northern two lots. The road, however, channelled water from an additional twelve-acre drainage area down the slope and across the two lots. Without the road, the water from these twelve acres would have drained directly into the bay.

In November 1990 and April 1991, two storms caused flooding on the two lots purchased from Kester. Water cut deep trenches in the driveway, and a storage shed was knocked off its foundation. On both occasions, the storm water flooded the drain field and septic system.

A civil engineer, Walter Pine, who testified as an expert for the Hoovers, stated that the flooding was caused by the diversion of water from the twelve additional acres onto the Hoovers' property. Pine testified that the existing drainage system could handle the natural nine acres of water runoff even in the event of a 100-year storm. But, the drain system could not handle the additional twelve acres of water runoff even during a twenty-five-year storm such as the one of November 1990.

These floods were not the first ones to occur on the northern two lots. Kester testified that a storm washed out part of the road near her property before the culvert was installed. Additionally, in 1986 Kester wrote in a letter to the County that a storm the previous winter had caused a river of water that nearly took her storage shed off its foundation and dug a six-foot trench on her beach. Kester also had to have her driveway graveled every few years because of the constant water drainage damage.

Sometime around 1978, before selling her lots to the Hoovers, Kester attempted to short plat her property. During this attempt, drainage and flooding problems were noted on the plat filed with the County Auditor's Office. The notations on the short plat stated:

A potential storm drainage problem exists in this plat area. An owner or their agent are [sic] advised to obtain profes-

sional engineering help for flood protection. Lots 1 and 2 [the lots owned by Kester] may be limited as to building site feasibility due to flooding across the southwesterly portion of these lots. The existing drainage course crossing this plat shall be retained and kept free and open to pass storm runoff through this or future subdivisions. Lots 1 and 2 [the lots owned by Kester] may be limited as to building site feasibility due to the steepness of slope across the west portion of these lots.

At trial, Robert Home, a realtor serving as an expert for the Hoovers, testified that this plat language would diminish the value of the property. Furthermore, Home indicated that an agent may be held liable for the failure to disclose this information to a prospective purchaser of the property. Although Kester rescinded the plat attempt in 1983, this rescission did not remove the original document from the files of the County Auditor's office.

The Hoovers filed suit against the County for the damage to the northern two lots caused by the floodings in 1990 and 1991, and requested an injunction requiring the County to complete storm drainage construction to prevent a recurrence of the damages. The Hoovers alleged that the County's actions in channelling and discharging the surface water onto their property amounted to an inverse condemnation and a taking or damaging of their property.[1] The County answered, claiming the defenses of comparative fault and acts of God.

After the close of the Hoovers' case, the County moved for a directed verdict, arguing that any taking had occurred either when the County constructed Horsehead Bay Drive in 1928 or when the culvert was installed in 1972, and that one who acquires title to property subsequent to the taking is not entitled to bring an inverse condemnation action. In response, the Hoovers argued that a separate cause of action in an inverse condemnation flooding case arises each time the land is flooded. The court denied the motion.

---

[1] Although acknowledging that, in a flood case, one can also allege trespass, negligence, or nuisance, the Hoovers did not assert these claims in their complaint, because they did not want "to confuse the jury with four different legal theories." *See* Br. of Resp't at 4 n.1; Br. of Appellant at app. 29.

At the close of the County's case, the Hoovers moved for a directed verdict on the issue of liability, arguing that the flooding constituted a continuing trespass that gave rise to a taking action. The court found that a taking had occurred, granted the motion, and instructed the jury on the issue of damages. The jury subsequently awarded the Hoovers $25,000 in damages. The court also awarded the Hoovers reasonable attorney fees, expert witness fees, and costs under RCW 8.25.070 in the amount of $33,285.06. RCW 8.25.070 provides for the awarding of attorney fees and expert witness fees to property owners in condemnation cases.

## DISCUSSION

### A. Taking Actions and Surface Water Drainage

Recovery for the taking or damaging of land by the government is provided for in the Washington State Constitution, which states, "No private property shall be taken or damaged for public . . . use without just compensation having been first made . . . ." Article I, § 16, amendment 9. The measure of damage in a taking case is the diminution in the fair market value of the property caused by the governmental taking or damaging. *Petersen v. Port of Seattle*, 94 Wn.2d 479, 482, 618 P.2d 67 (1980). In an inverse condemnation action, such as this, the land owner institutes the action, rather than the governmental entity possessing the condemnation power. *Martin v. Port of Seattle*, 64 Wn.2d 309, 313-14, 391 P.2d 540 (1964), *cert. denied*, 379 U.S. 989 (1965).

While the constitution guarantees recovery for a taking, not every trespass upon or tortious damaging of real property becomes a constitutional taking or damaging simply because the trespasser or tortfeasor is the state or one of its subdivisions. *Miotke v. City of Spokane*, 101 Wn.2d 307, 334, 678 P.2d 803 (1984) (citing *Olson v. King County*, 71 Wn.2d 279, 284, 428 P.2d 562 (1967)). Whether a taking has occurred depends on the nature of the interference, as the court has stated:

The major decisions of this court considering the difficult distinction between a constitutional taking under article 1, section 16, and a mere tortious interference, are in agreement that a constitutional taking is a permanent (or recurring) invasion of private property. . . . Temporary interference with a private property right, which is not continuous nor likely to be reoccurring, does not constitute condemnation without compensation.

*Northern Pac. Ry. Co. v. Sunnyside Valley Irrigation Dist.*, 85 Wn.2d 920, 924, 540 P.2d 1387 (1975) (citations omitted). Furthermore, under the theory of inverse condemnation, the damage to the property must be permanent to be compensable. *Wilson v. Key Tronic Corp.*, 40 Wn. App. 802, 816, 701 P.2d 518 (1985).

The damage in this case was caused by surface waters. Surface waters are defined as the waters produced by rain, melting snow, and springs. *King County v. Boeing Co.*, 62 Wn.2d 545, 550, 384 P.2d 122 (1963). In cases of water damage caused by street drainage, a municipality is not liable for consequential damages caused by the increased flow of surface water resulting from the presence of streets. *Wilber Dev. Corp. v. Les Rowland Constr., Inc.*, 83 Wn.2d 871, 874, 523 P.2d 186 (1974). However, the municipality may not collect surface water by artificial means, channel the water, and deposit it on private property, thereby causing damage, unless the municipality compensates the owner. *Wilber*, 83 Wn.2d at 874-75; *see also Burton v. Douglas County*, 14 Wn. App. 151, 156, 539 P.2d 97, *review denied*, 86 Wn.2d 1007 (1975). Thus, the injurious flow of water upon a person's land will support an inverse condemnation action in the proper case. *B & W Constr. v. City of Lacey*, 19 Wn. App. 220, 223, 577 P.2d 583 (1978).

In the present case, the County's construction of Horsehead Bay Drive and the drainage culvert caused the collection of surface water from twelve acres of land and artificially channelled it down the slope, through the culvert, and onto the Hoovers' property. As a result, the northern two lots were subjected to recurring floods and

erosion that limited building site feasibility. Because the resultant flooding permanently restricted building and development on a portion of the property, diminishing the value of the lots, the County's actions constituted a constitutional taking. *Buxel v. King County*, 60 Wn.2d 404, 409, 374 P.2d 250 (1962).

### B. The Hoovers' Status as a Subsequent Purchaser

The County, however, argues that any taking in this case occurred either when the road was constructed in 1928, or when the culvert was installed in 1972. Therefore, the County contends that the Hoovers have no standing to sue for the flooding damage because they are subsequent purchasers of the northern two lots. The Hoovers respond that their action is based on damage caused by flooding in 1990 and 1991; that each flood damage that occurs following a storm creates a new taking cause of action; and that therefore they are not subsequent purchasers.

Washington case law holds, "Ordinarily, a grantee or purchaser cannot sue for a taking or injury occurring prior to his acquisition of title, but he may sue for any new taking or injury." *State v. Sherrill*, 13 Wn. App. 250, 257 n.1, 534 P.2d 598 (quoting 30 C.J.S., *Eminent Domain* § 390, at 461 (1965) (footnotes omitted)), *review denied*, 86 Wn.2d 1002 (1975). Treatise commentary and case law from other jurisdictions agree with this rule.

> The general rule, both under the statutes and in the absence of statutory provision, is that where property is taken or injured under the exercise of the power of eminent domain, the owner thereof at the time of the taking or injury is the proper person to initiate proceeding or sue therefor.

29A C.J.S. *Eminent Domain* § 383, at 757 (1992); *see also Nichols on Eminent Domain* § 5.01[4] (ed. 1995); *Riddock v. City of Helena*, 212 Mont. 390, 687 P.2d 1386 (1984) (property owner could not maintain inverse condemnation action for construction that occurred on land then owned by predecessor in interest). Because the right to damages for an

injury to property is a personal right belonging to the property owner, the right does not pass to a subsequent purchaser unless expressly conveyed. *Gillam v. City of Centralia*, 14 Wn.2d 523, 530, 128 P.2d 661 (1942). Furthermore, the court has found that no taking damages should be awarded to plaintiffs who acquired property for a price commensurate with its diminished value. *City of Walla Walla v. Conkey*, 6 Wn. App. 6, 17, 492 P.2d 589 (1971), *review denied*, 80 Wn.2d 1007 (1972).

In the present case the flooding problems caused by the county road were evident well before the Hoovers bought the two lots in 1988. Moreover, the rescinded plat, still in the County records, contained notice of the land's propensity for flooding that would reduce its value. The purchase price of the property, therefore, either did reflect or should have reflected the diminished value of the land caused by its propensity to flood.

■ Although purchasers may not recover for a prior taking, they may sue for any new takings that occur after acquiring the property. *Sherrill*, 13 Wn. App. at 257 n.1; 29A C.J.S. *Eminent Domain* § 384, at 758-59 (1992). Thus, the determinative question in this case is whether the floodings which occurred in 1990 and 1991, after the Hoovers purchased the property, gave rise to new causes of action.

A new taking cause of action accrues with each measurable or provable decline in market value of the property. *Highline Sch. Dist. 401 v. Port of Seattle*, 87 Wn.2d 6, 15, 548 P.2d 1085 (1976). Furthermore, additional activity, following a judgment for a damaging, that causes further damaging is compensable as a taking. *Petersen*, 94 Wn.2d at 483. The *Highline* and *Petersen* decisions concern a series of taking actions that were brought as a result of the gradual expansion and development of Sea-Tac Airport. The *Petersen* court noted that, for example, when jet-powered aircraft began to be used at the airport, an entirely new noise environment was created, thereby permitting a new taking cause of action. *See Petersen*, 94

Wn.2d at 483, 486. In *Highline*, the court found that a new cause of action accrued where the intensity of the interference had increased over time. *See Highline*, 87 Wn.2d at 15. In that case, the number of flights had more than doubled and noisier jets had replaced propeller aircraft at the airport. *Highline*, 87 Wn.2d at 8.

■ Surface water flooding cases in Washington also support the proposition that a new taking cause of action arises when additional governmental action occurs. In *Buxel* the plaintiff's land was subjected to minor seepage from a system of drains and culverts over a period of years. *Buxel*, 60 Wn.2d at 405. However, in 1958, King County connected an entire subdivision to the drain system, changing the plaintiff's previously minor seepage problem into an inundation problem. *Buxel*, 60 Wn.2d at 405-06. In response to the county's contention that any taking had occurred when the drainage system was first constructed, the *Buxel* court noted that the plaintiff was seeking recovery for the injury that occurred when the county caused the flow of water across her property to increase as a result of the new construction. *Buxel*, 60 Wn.2d at 407.

Other jurisdictions are in accord with this principle. For example, in *Cereghino v. Highway Comm'n*, 230 Or. 439, 445, 370 P.2d 694 (1962), the Oregon Supreme Court ruled that a plaintiff could not recover damages for future flooding caused by an existing state highway drainage system under a taking theory. The plaintiff had already been compensated for the depreciation in value of the land as a result of the previous flooding, and therefore, could not maintain another taking cause of action. However, the court stated that the plaintiff could recover, as an additional taking, if a change in the drainage system occurred that resulted in increased flooding. *Cereghino*, 230 Or. at 445.

In the present case, the Hoovers do not claim that there was any additional government action by Pierce County since the installation of the culvert in 1972. Rather, they contend that a new taking cause of action arises with each

flood, absent additional governmental action. We reject this contention. The Hoovers do not cite, nor did research disclose, any authority for their position. Moreover, such a contention runs contrary to the principle contained in, not only the Sea-Tac Airport cases, but also *Buxel* and the *Cereghino* decision from Oregon; a new taking cause of action requires additional governmental action causing a measurable decline in market value.

In summary, the County has not undertaken any new action since installing the roadway culvert in 1972; thus, no new taking cause of action has arisen, and the Hoovers, as subsequent purchasers, may not recover for a taking that occurred prior to their ownership. Therefore, we hold that the trial court erred in granting the Hoovers' motion for a directed verdict and in denying the County's motion. In light of our holding, we need not address the remaining assignments of error.

We reverse the directed verdict for the Hoovers and remand for entry of a directed verdict in favor of the County.

SEINFELD, C.J., and HOUGHTON, J., concur.

Reconsideration denied November 3, 1995.

Review denied at 129 Wn.2d 1007 (1996).