FILED
COURT OF APPEALS
DIVISION II

2014 JUN -3 AM 8: 36

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PACIFIC HIGHWAY PARK, LLC, | No. 44198-5-II |
| Appellant, | |
| v. | |
| WASHINGTON STATE DEPARTMENT OF TRANSPORTATION, | UNPUBLISHED OPINION |
| Respondent. | |

MAXA, J. — Pacific Highway Park, LLC (PHP) appeals the trial court's dismissal on summary judgment of its claims against the Washington State Department of Transportation (WSDOT) for inverse condemnation, trespass, and damage to property under RCW 4.24.630. PHP alleged that these claims arose from WSDOT's alterations to surface water drainage facilities in a 2001 project to widen nearby State Route (SR) 99, which allegedly resulted in the deposit of excess stormwater on PHP's property.

We hold that (1) because PHP did not purchase the property at issue until after the alleged taking occurred, the subsequent purchaser doctrine precludes PHP from asserting an inverse condemnation claim; (2) questions of fact exist about whether WSDOT's 2001 drainage work resulted in an invasion of PHP's property; and (3) PHP's trespass and RCW 4.24.630 claims are not precluded on other legal grounds. Therefore, we hold that the trial court properly dismissed on summary judgment PHP's inverse condemnation claim but erred in granting

summary judgment on PHP's trespass and RCW 4.24.630 claims. We affirm in part, reverse in part, and remand for further proceedings.

FACTS

PHP purchased the property at issue in 2006. The property is adjacent to and west of SR 99. The southeastern portion of the property is the lowest part of the property, and this low area is part of a larger wetland/basin area adjacent to SR 99. The low point of the basin is near the eastern property line. The original construction of SR 99 (more than 80 years ago) cut off drainage from the west to the east. Stormwater on the west side of SR 99 was conveyed primarily through an open ditch system to the basin area. The only drainage outlet from the basin area was a 24-inch culvert that ran under SR 99 and connected to the county storm sewer system on the east side.

In 2001, WSDOT widened SR 99 adjacent to what is now PHP's property. As part of this project, WSDOT installed a 36-inch pipe along the west side of SR 99 to replace the open ditch stormwater conveyance system. A 54-inch catch basin adjacent to the PHP property now collects the water from the 36-inch pipe. WSDOT also installed 18-inch and 24-inch pipes that run from the PHP property and connect to the catch basin. The catch basin connects to the pre-existing 24-inch culvert under SR 99. Gravity carries the stormwater from the catch basin through the culvert under SR 99 to WSDOT-owned stormwater detention and treatment ponds on the east side of SR 99.

PHP's expert Norman Olson stated that although the 18-inch and 24-inch pipes appear to flow into the catch basin, they in fact accommodate flow in both directions depending on the amount of stormwater water present. According to Olson, at high storm water flows the catch

basin is inundated and backflows through the pipes onto PHP's property. WSDOT engineer Fred Tharp confirmed that water could flow from WSDOT's pipe system back onto PHP's property. PHP contends that WSDOT designed this system to allow use of PHP's property as a detention pond for excess stormwater in high flow events, which causes the property to be unusable for planned development.

PHP applied for a conditional use permit from Pierce County to develop the property for operation of a semi-trailer storage business. Pierce County determined that two wetlands existed on the property, which would impact PHP's proposed use of the property. PHP unsuccessfully appealed to the Pierce County hearing examiner. PHP next filed a Land Use Petition Act (LUPA)[1] petition in superior court to appeal the hearing examiner's decision and asserted an inverse condemnation claim against Pierce County. PHP also included a claim for inverse condemnation against WSDOT for the alleged storage of stormwater on the property.

PHP and Pierce County subsequently negotiated an interim settlement. As part of the settlement, the hearing examiner vacated his earlier decision and approved the conditional use permit and wetland variance, allowing PHP to develop a portion of its property. By stipulated order, the trial court dismissed PHP's LUPA petition and inverse condemnation claim against Pierce County.

PHP's remaining claim was an inverse condemnation claim against WSDOT. PHP filed an amended complaint, adding claims of trespass and damage to property under RCW 4.24.630 against WSDOT. WSDOT moved for summary judgment on liability. The trial court granted WSDOT's motion for summary judgment and dismissed all of PHP's claims. PHP appeals.

---

[1] Chapter 36.70C RCW.

## ANALYSIS

### A.   STANDARD OF REVIEW

We review a trial court's order granting summary judgment de novo. *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 271, 285 P.3d 854 (2012). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Donatelli v. D.R. Strong Consulting Eng'rs, Inc.*, 179 Wn.2d 84, 90, 312 P.3d 620 (2013). "A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation." *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). In making this determination, we must view the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Donatelli*, 179 Wn.2d at 90. If reasonable minds can reach only one conclusion on an issue of fact, that issue may be determined on summary judgment. *M.A. Mortenson Co. v. Timberline Software Corp.*, 140 Wn.2d 568, 579, 998 P.2d 305 (2000).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). A moving defendant can meet this burden by showing that there is an absence of evidence to support the plaintiff's case. *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 624, 818 P.2d 1056 (1991). The burden then shifts to the plaintiff to come forward with sufficient evidence to establish the existence of each essential element of the plaintiff's case. *Howell*, 117 Wn.2d at 625. If the plaintiff does not submit such evidence, summary judgment is appropriate. *Howell*, 117 Wn.2d at 625.

A nonmoving party must present more than "mere possibility or speculation" to successfully oppose summary judgment. *Doe v. Dep't of Transp.*, 85 Wn. App. 143, 147, 931 P.2d 196 (1997). "[M]ere allegations, denials, opinions, or conclusory statements" do not establish a genuine issue of material fact. *Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co.*, 122 Wn. App. 736, 744, 87 P.3d 774 (2004).

B.   INVERSE CONDEMNATION CLAIM

   1.   Legal Principles

Article I, section 16 of the Washington Constitution imposes limits on the State's inherent power of eminent domain by requiring the government to pay reasonable compensation for taking or damaging private property for public use. *Phillips v. King County*, 136 Wn.2d 946, 956 & n.3, 968 P.2d 871 (1998). Inverse condemnation is an action instituted by a landowner "to recover the value of property which has been appropriated in fact, but with no formal exercise of the power of eminent domain." *Phillips*, 136 Wn.2d at 957. This theory originally was developed to provide a remedy because the government could not be sued in tort. *Tom v. State*, 164 Wn. App. 609, 614, 267 P.3d 361 (2011).

The elements of an inverse condemnation claim are (1) a taking or damaging (2) of private property (3) for public use (4) without just compensation (5) by a governmental entity that has not instituted formal eminent domain proceedings. *Phillips*, 136 Wn.2d at 957. With regard to the first element, a taking occurs when the government "invades or interferes with the use and enjoyment of a person's property, causing the property to lose value." *Tom*, 164 Wn. App. at 614. A constitutional taking is a permanent (or reoccurring) invasion of private property

that causes permanent damage. *Hoover v. Pierce County*, 79 Wn. App. 427, 432, 903 P.2d 464 (1995).

    2.   Subsequent Purchaser Doctrine

The alleged inverse condemnation (if any) apparently occurred in 2001, when WSDOT widened SR 99 and installed the drainage pipes that allegedly allow for the deposit of excess stormwater on PHP's property. PHP did not acquire the property until 2006. The threshold question is whether PHP is precluded from bringing an inverse condemnation action because it did not own the property in 2001.

Generally, an inverse condemnation claim is personal to and actionable only by the owner of the property at the time of the taking. *Gillam v. City of Centralia*, 14 Wn.2d 523, 530, 128 P.2d 661 (1942); *Hoover*, 79 Wn. App. at 433-34. The property owner's right to damages for injury to the property does not pass to a subsequent purchaser unless expressly conveyed. *Crystal Lotus Enters., Ltd. v. City of Shoreline*, 167 Wn. App. 501, 505 & n.8, 274 P.3d 1054 (2012). This rule, called the "subsequent purchaser doctrine," is based on the assumption that the price paid by a subsequent purchaser reflects the damaged state of the property. *See Wolfe v. Dep't of Transp.*, 173 Wn. App. 302, 308-09, 293 P.3d 1244, *review denied*, 177 Wn.2d 1026 (2013) (where alleged appropriation occurred prior to the purchase of the property, purchase price presumed to reflect diminished value); *Crystal Lotus*, 167 Wn. App. at 505 ("the price of property is deemed to reflect its condition at the time of the sale, including any injury because of government interference"); *see also Tom*, 164 Wn. App. at 614.

In *Hoover*, we remanded for entry of a directed verdict dismissing an inverse condemnation claim of a subsequent purchaser where the flooding problems were evident at the

time of the purchase and county records contained notice of the land's propensity for flooding. 79 Wn. App. at 434, 436. We held that the purchase price either did reflect or should have reflected the diminished value of the land caused by its propensity to flood. *Hoover*, 79 Wn. App. at 434. Likewise, in *Crystal Lotus*, Division One of this court rejected an inverse condemnation claim by a subsequent purchaser for a swamp-like condition that was apparent at the time of the conveyance, which plaintiffs alleged was a result of stormwater drainage from the government system that drained onto an adjacent lot, traveled underground, and surfaced on the plaintiff's lot. 167 Wn. App. at 503-05. And in *Wolfe* we applied the subsequent purchaser doctrine and dismissed an inverse condemnation claim based on plaintiffs' allegations that WSDOT's improvement of a bridge in 1986 caused ongoing erosion to property which they purchased in 2003 and 2004. 173 Wn. App. at 307-09.

The Minnesota Supreme Court explained the reason for the subsequent purchaser doctrine:

> The rationale behind this rule seems to be simple and logical. When the government interferes with a person's right to possession and enjoyment of his property to such an extent so as to create a 'taking' in the constitutional sense, a right to compensation vests in the person owning the property at the time of such interference. This right has the status of property, is personal to the owner, and does not run with the land if he should subsequently transfer it without an assignment of such right. The theory is that where the government interferes with a person's property to such a substantial extent, the owner has lost a part of his interest in the real property. Substituted for the property loss is the right to compensation. When the original owner conveys what remains of the realty, he does not transfer the right to compensation for the portion he has lost without a separate assignment of such right. If the rule were otherwise, the original owner of damaged property would suffer a loss and the purchaser of that property would receive a windfall. Presumably, the purchaser will pay the seller only for the real property interest that the seller possesses at the time of the sale and can transfer.

*Brooks Inv. Co. v. City of Bloomington*, 305 Minn. 305, 315-16, 232 N.W.2d 911 (1975).

Here, PHP did not acquire the property until after the alleged inverse condemnation was complete. And there is no allegation that PHP obtained any right to damages from the prior owner. Therefore, PHP's inverse condemnation claim is foreclosed if the subsequent purchaser doctrine applies. *See Wolfe*, 173 Wn. App. at 308-09; *Crystal Lotus*, 167 Wn. App. at 505 & n.8; *Hoover*, 79 Wn. App. at 433-34.

3. Latent Condition Exception

PHP argues that the subsequent purchaser doctrine should not apply when the condition giving rise to the inverse condemnation claim was latent and undiscovered at the time the property was purchased. However, we need not decide the existence of a latent condition exception to the subsequent purchaser doctrine because under the facts in this case, PHP has not created a question of fact as to whether WSDOT's alleged use of the property for stormwater detention was a latent condition.

With respect to its trespass claim (discussed below), PHP argues that there is evidence that deposit of excess stormwater on the property has occurred beginning in 2001 and has rendered a portion of the property undevelopable. PHP's expert Olson opined that after WSDOT's drainage work in 2001, stormwater flowed from SR 99 onto PHP's property during times of high flow. Olson stated that given the configuration of the drainage facilities and WSDOT's own 2001 drainage report, "it is *apparent* that the property is being used to store stormwater." Clerk's Papers (CP) at 256-57 (emphasis added).

PHP has provided no evidence that the storage of excess stormwater on PHP's property was a latent condition. Further, PHP's position regarding its trespass claim and Olson's testimony are inconsistent with a latent condition claim. Therefore, we need not address whether

8

there is a latent defect exception to the subsequent purchaser rule that would apply under different facts.

4.   New Taking

Subsequent purchasers may sue for any new takings that occur after acquiring the property. *Hoover*, 79 Wn. App. at 434. "A new taking cause of action accrues with each measurable or provable decline in market value of the property." *Hoover*, 79 Wn. App. at 434; *see Highline Sch. Dist. 401 v. Port of Seattle*, 87 Wn.2d 6, 15, 548 P.2d 1085 (1976) (new cause of action where the intensity of the interference had increased over time); *Buxel v. King County*, 60 Wn.2d 404, 407-09, 374 P.2d 250 (1962) (new cause of action accrued where minor drainage problem was exacerbated by a new connection). But to bypass the subsequent purchaser rule, the owner must show some " '*additional governmental action* causing a measurable decline in market value' " after the plaintiff's purchase of the property. *Wolfe*, 173 Wn. App. at 308 (footnote omitted) (quoting *Hoover*, 79 Wn. App. at 436).

PHP argues that the stormwater conveyance system along SR 99 near its property has materially changed since it purchased the property in 2006. It contends that a wetland to the north of the PHP property was filled in and a constructed ditch carries surface water to a pipe that appears to join the 36-inch line at the catch basin upstream from PHP's property. However, PHP did not submit evidence that WSDOT owned or altered this wetland and did not submit evidence that the change occurred after PHP purchased the property in 2006. As a result, the alleged filling in of the wetland does not support PHP's claim because there is no evidence that it constituted government action or that it occurred after PHP purchased its property.

We hold that the subsequent purchaser doctrine precludes PHP from pursuing an inverse condemnation claim against WSDOT and that no new governmental taking has occurred since PHP purchased the property. Accordingly, we affirm the trial court's summary judgment order dismissing PHP's inverse condemnation claim.

D.     TRESPASS AND RCW 4.24.630 CLAIMS

PHP's amended complaint asserted claims for common law trespass and damage to property under RCW 4.24.630 (1) (collectively "trespass claims"). WSDOT argues that the trial court properly dismissed these claims[2] because (1) any trespass claim was subsumed in the inverse condemnation cause of action, (2) PHP produced no evidence of any actual invasion of its property, (3) PHP produced no evidence that alleged invasion resulted from WSDOT's 2001 project, (4) the common enemy doctrine precludes PHP from recovering for trespass relating to surface water, and (5) the statute of limitations bars PHP's trespass claims. We reject WSDOT's arguments, and hold that the trial court erred in granting summary judgment on PHP's trespass and RCW 4.24.630 claims.

1.     Inverse Condemnation and Trespass Claims

WSDOT argues that PHP's trespass claims are subsumed in the inverse condemnation claim. We disagree.

First, because we have held here that PHP cannot assert an inverse condemnation claim under these facts, there is no inverse condemnation claim into which PHP's trespass claims could

---

[2] The trial court did not expressly mention the trespass and RCW 4.24.630 claims in either its memorandum decision or its order granting summary judgment. However, the trial court's order granted summary judgment dismissal on all claims, which includes the trespass and waste claims.

be subsumed. We need not decide whether a trespass claim would be subsumed into a viable inverse condemnation claim arising from the same facts.

Second, WSDOT cites no authority holding that a party cannot assert both inverse condemnation and trespass claims. In fact, in *Crystal Lotus* – one of the cases WSDOT cites – the court addressed both inverse condemnation and continuing trespass without indicating that the inverse condemnation claim precluded the trespass claim. 167 Wn. App. at 504-506. And our Supreme Court has stated that a trespass upon property is not necessarily a taking just because the trespasser is a public entity. *Dickgieser*, 153 Wn.2d at 541; *Olson*, 71 Wn.2d at 284 ("Every trespass upon, or tortious damaging of real property does not become a constitutional taking or damaging simply because the trespasser or tortfeasor is the state or one of its subdivisions, such as a county or a city.").

WSDOT relies primarily on a footnote in *Wolfe*, 173 Wn. App. at 306 n.2, in which we stated that the takings claim subsumed the trespass claim "as discussed with counsel at oral argument." Because our statement in *Wolfe* is based on an unknown discussion with counsel at oral argument rather than any cited legal authority and because it is inconsistent with the cases noted above, it is not persuasive here. Accordingly, we hold that PHP's trespass claims are not subsumed into PHP's dismissed inverse condemnation claim.

2. Invasion of Property

PHP presented little direct evidence that some trespass or damage relating to the invasion of stormwater has occurred on its property as a result of the 2001 SR 99 project. However, we must view the evidence and all reasonable inferences therefrom in the light most favorable to

11

PHP. *Donatelli*, 179 Wn.2d at 90. Considering the evidence in this light, we hold that there is a question of fact on the existence of some invasion of PHP's property.

A common law trespass is "an intrusion onto the property of another that interferes with the other's right to exclusive possession." *Hedlund v. White*, 67 Wn. App. 409, 418 n.12, 836 P.2d 250 (1992). "To establish intentional trespass, a plaintiff must show (1) invasion of property affecting an interest in exclusive possession, (2) an intentional act, (3) reasonable foreseeability the act would disturb the plaintiff's possessory interest, and (4) actual and substantial damages." *Crystal Lotus*, 167 Wn. App. at 506. RCW 4.24.630 (1) provides:

> Every person who goes onto the land of another and who removes timber, crops, minerals, or other similar valuable property from the land, or wrongfully causes waste or injury to the land, or wrongfully injures personal property or improvements to real estate on the land, is liable to the injured party for treble the amount of the damages caused by the removal, waste, or injury.

Both claims require that the defendant's conduct cause some invasion of or entry onto the plaintiff's property.

PHP argues that WSDOT invaded and damaged its property, alleging that the stormwater system WSDOT installed results in the backflow of stormwater onto PHP's property. WSDOT argues that summary judgment is appropriate on this issue because even if WSDOT's stormwater system theoretically allows a backflow of stormwater onto PHP's property under certain conditions, there is no evidence that this backflow actually has occurred.

Upon initial review, WSDOT appears to have the better argument. No PHP witness – including PHP manager Richard Wells and experts Olson and Steven Neugebauer – has ever actually observed water coming out of the SR 99 stormwater system onto the PHP property. And PHP produced no clear evidence that excess stormwater has in fact been present on PHP's

property. PHP's key evidence is Olson's declaration, in which he opines that WSDOT's system is designed so that during high stormwater flows water will backflow onto PHP's property. But this opinion standing alone is not enough to demonstrate that WSDOT's system has in fact deposited excess stormwater onto PHP's property.

Nevertheless, reading Olson's declaration in the light most favorable to PHP and drawing all reasonable inferences in PHP's favor leads to the conclusion that PHP has created a question of fact on whether an invasion of its property has occurred. The determining factor is that Olson's declaration refers to WSDOT's storage of stormwater on PHP's property in the present tense. Olson states: (1) "WSDOT *uses* the [PHP] property to store this stormwater at times of high flow", CP at 255 (emphasis added); (2) "[a]t times of high stormwater flow . . . hydraulic pressure *forces* backflow . . . on to the [PHP] property, where the excess stormwater *is* stored in what . . . has many of the characteristics of a detention pond", CP at 256 (emphasis added and emphasis omitted); and (3) "[g]iven the facts . . . regarding the as-built configuration of the WSDOT-owned storm system . . . it is apparent that the property *is* being used to store stormwater." CP at 256-57 (emphasis added).

WSDOT argues that Olson's testimony is based only on theory. And in fact, Olson does not expressly state that he actually has observed the conditions he describes. However, it is reasonable to infer that Olson has visited and inspected the property. He states that he prepared detailed stormwater studies of the property and surrounding areas and inspected the stormwater piping, which generally would require a property visit. As a result, viewed in a light most favorable to PHP, the evidence leads to a reasonable inference that Olson's present tense

descriptions are based on his personal observations of excess stormwater being stored on PHP's property.

We hold that PHP has presented enough evidence and/or inferences from that evidence to create a question of fact on whether there has been an invasion of its property. We emphasize that this holding is based primarily on inferences and not on direct evidence. Accordingly, on remand, WSDOT will be free to challenge the basis for Olson's testimony and explore further whether some invasion actually has occurred.[3]

3.    Cause of Invasion

WSDOT argues that even if excess stormwater has invaded PHP's property, the 2001 drainage work did not cause that invasion. WSDOT points out that the PHP property had drainage problems long before 2001, and that PHP presented no evidence that the 2001 drainage work altered the drainage in the area or resulted in any trespass or damage to PHP's property[4].

However, Olson provided clear testimony that WSDOT's 2001 work altered the drainage system and operated to deposit excess stormwater on PHP's property. Crediting PHP's evidence that excess stormwater did invade PHP's property, there is also enough evidence to demonstrate that the invasion may have resulted from WSDOT's conduct. Accordingly, summary judgment is not appropriate on this issue.

---

[3] Our opinion should not be read as precluding WSDOT from bringing another summary judgment motion on this issue if appropriate.

[4] WSDOT actually made this argument in the context of PHP's inverse condemnation claim, but the same arguments apply to the trespass and RCW 4.24.630 claims.

### 4. Common Enemy Doctrine

WSDOT argues that because this case involves the management of surface water, the common enemy doctrine bars PHP's trespass and RCW 4.24.630 claims.

The "common enemy doctrine" limits landowners' liability for impacts from their management of surface water, which is defined as water from precipitation or escaping from streets or rivers which ceases to "maintain its identity and existence as a body of water." *Fitzpatrick*, 169 Wn.2d at 607. Under the common enemy doctrine:

> Water that meets the definition of surface water "is regarded as an outlaw and a common enemy against which anyone may defend himself, even though by so doing injury may result to others." *Cass* [*v. Dicks*], 14 Wash. [75,] 78, 44 P. 113 [(1896)]. The common enemy rule, therefore, provides that "[i]f one in the lawful exercise of his right to control, manage or improve his own land, finds it necessary to protect it from surface water flowing from higher land, he may do so, and if damage thereby results to another, it is [damage without remedy]." [Cass, 14 Wash. at 78].

*Fitzpatrick*, 169 Wn.2d at 607 (some alterations in original). Under this rule, "the flow of surface water along natural drains may be hastened or incidentally increased by artificial means, so long as the water is not ultimately diverted from its natural flow onto the property of another." *Wilber Dev. Corp. v. Les Rowland Const. Inc.*, 83 Wn.2d 871, 875, 523 P.2d 186 (1974); *see Trigg v. Timmerman*, 90 Wash. 678, 682, 156 P. 846 (1916) (no liability for collecting water in a ditch).

However, the common enemy doctrine does not apply when a person artificially collects water and directs that water onto another's property. *See Feeley v. E.R. Butterworth & Sons*, 42 Wn.2d 837, 842, 259 P.2d 393 (1953) (cannot convey by artificial means, a concealed drain pipe); *Harkoff v. Whatcom County*, 40 Wn.2d 147, 151, 241 P.2d 932 (1952) (county had duty to

construct roadside drainage ditches/culverts of sufficient capacity to carry drainage waters in a manner as not to overflow onto the property of others). Our Supreme Court stated that

> municipal authorities may pave and grade streets and are not ordinarily liable for an increase in surface water naturally falling on the land of a private owner where the work is properly done, they are not permitted to concentrate and gather such water into artificial drains or channels and throw it on the land of an individual owner in such manner and volume as to cause substantial injury to such land and without making adequate provision for its proper outflow, unless compensation is made. . . . Surface waters may not be artificially collected and discharged upon adjoining lands in quantities greater than or in a manner different from the natural flow thereof.

*Wilber*, 83 Wn.2d at 874-875 (internal citations omitted).

The prohibition described in *Wilber* applies here. PHP alleges that WSDOT replaced the roadside ditch with a 36-inch buried pipe that gathers water from outside the natural drainage basin. PHP also argues that the pipe is a different method and carries a different amount of water onto the PHP property. For instance, at high flows the ditch flooded several adjoining properties, but now more water reaches the catch basin and more rapidly by way of the pipe, and any water that cannot pass though the 24-inch culvert under SR 99 floods onto the PHP property exclusively.

According to Olson, calculations from WSDOT's hydraulic report showed that replacing the open ditch with 24-inch pipe would be inadequate in times of high flows. WSDOT upsized the roadside pipe to 36 inches to move the water to the catch basin adjacent to the PHP property more efficiently, but WSDOT did not upsize the existing pipe that runs under SR 99. PHP argues that this shortcut created a bottleneck and that WSDOT installed two pipes connecting its catch basin to the PHP property so stormwater that could not flow under the highway would backflow onto the PHP property.

Based on the evidence that WSDOT collected surface water into a pipe that transported the water to a smaller culvert under the highway and provided a pipe to allow backflow onto PHP's property for large storm events, it cannot be said *as a matter of law* that the common enemy doctrine would bar PHP's claims for trespass and damage to land under RCW 4.24.630. There is at least a question of fact on the doctrine's applicability. Accordingly, we hold that the common enemy doctrine does not provide a basis for summary judgment dismissal of PHP's trespass and RCW 4.24.630 claims.

### 5. Statute of Limitations

RCW 4.16.080 imposes a three-year statute of limitations for trespass or waste upon real property. WSDOT argues that this statute of limitations forecloses PHP's trespass and RCW 4.24.630 claims because it committed no relevant acts resulting in the invasion of PHP's property within the three-year statute of limitations. WSDOT apparently claims that any trespass of or damage to PHP's property first occurred, and the statute of limitations started running, at the date of purchase in November 2006, which is more than three years before PHP filed its initial complaint against WSDOT in March 2010 and its amended complaint asserting the trespass and RCW 4.24.630 claims in February 2012. However, because genuine questions of material fact remain concerning (1) when the alleged invasion first occurred, (2) when it was reasonably discoverable, and (3) whether the alleged trespass is abatable (and therefore continuing in nature) or permanent, we hold that the statute of limitations is not a basis for summary judgment dismissal of the trespass and RCW 4.24.630 claims.

Washington recognizes the theory of continuing trespass, which impacts application of the statute of limitations. *See Woldson v. Woodhead*, 159 Wn.2d 215, 219, 149 P.3d 361 (2006).

A claim for trespass will be barred if not brought within three years of the injury unless it may properly be characterized as a continuing trespass. *Fradkin v. Northshore Util. Dist.*, 96 Wn. App. 118, 124, 977 P.2d 1265 (1999). For continuing trespass, the statute of limitations serves only to limit recoverable damages and does not preclude an action against the trespasser. *Wallace v. Lewis County*, 134 Wn. App. 1, 15, 137 P.3d 101 (2006). The rule is that the statute of limitations only excludes recovery for any trespass occurring more than three years before the complaint is filed. *Woldson*, 159 Wn.2d at 219. The property owner can recover for any continuing trespass occurring less than three years before the filing date until the date of trial. *Woldson*, 159 Wn.2d at 222-23.

The difference between a permanent and a continuing trespass is that a continuing trespass is abatable, while a permanent trespass is not. *Fradkin*, 96 Wn. App. at 125. "A trespass is abatable, irrespective of the permanency of any structure involved, so long as the defendant can take curative action to stop the continuing damages. The condition must be one that can be removed 'without unreasonable hardship and expense.' " *Fradkin*, 96 Wn. App. at 125-26 (footnote omitted) (quoting *Mangini v. Aerojet-General Corp.*, 12 Cal. 4th 1087, 1097, 912 P.2d 1220 (1996)). "Periodic flooding due to defective construction of a drainage system is a recognized fact pattern in the category of continuing trespass." *Fradkin*, 96 Wn. App. at 126. However, whether a trespass is continuing or permanent generally is a question of fact. *See Fradkin*, 96 Wn. App. at 126.

Here, determining whether the statute of limitations bars recovery for PHP's trespass and RCW 4.24.630 claims requires additional factual development in the superior court. There are material questions of fact about when injury first occurred, when it should have been discovered,

and whether the alleged trespass is abatable. Therefore, we agree with PHP that the statute of limitations affirmative defense would not be a basis for summary judgment dismissal of PHP's trespass and RCW 4.24.630 claims.

E.    ESTOPPEL REGARDING EXISTENCE OF WETLAND

WSDOT argues that PHP should not be allowed to assert claims against it premised on WSDOT's alleged use of its property for stormwater detention when the existence of wetlands on PHP's property has been legally established. WSDOT contends that the existence of the wetlands was established by final findings from PHP's administrative land use dispute with Pierce County. According to WSDOT, because there are wetlands on the property, there cannot be detention ponds on the property, and therefore WSDOT cannot be liable for creating detention ponds. We disagree.

Even if we assume that PHP should be estopped from relitigating the existence of wetlands, it is not clear why the presence of preexisting wetlands would defeat PHP's inverse condemnation claim or trespass claims against WSDOT. The viability of these claims does not depend on the resolution of whether or not a wetland exists on the property. Olson's calculations show that the WSDOT-caused flooding flows beyond the boundary and buffer of the wetland PHP stipulated to for permitting purposes. Therefore, the presence or absence of a wetland is relevant only to the amount of damages. Further, whether there is a wetland or not, WSDOT's alleged use of the area as a detention facility could constitute a taking, trespass, or result in damage to the property. Therefore, we hold that WSDOT has not shown that estoppel relating to the existence of wetlands on PHP's property requires summary judgment dismissal of PHP's inverse condemnation claim or trespass and RCW 4.24.630 claims.

No. 44198-5-II

We affirm the superior court's order granting summary judgment to WSDOT on PHP's inverse condemnation claim, but reverse the dismissal of PHP's trespass and RCW 4.24.630 claims. We remand for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

HUNT, J.

BJORGEN, ACJ

20