## NOTICE: SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 3, 2023

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 3, 2023

ERIN L. LENNON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| BROCK MASLONKA and DIANE MASLONKA, a marital community, | ) ) ) | |
| Respondents, | ) ) | No. 101241-1 |
| v. | ) ) | En Banc |
| PUBLIC UTILITY DISTRICT NO. 1 OF PEND OREILLE COUNTY and PORT OF PEND OREILLE, | ) ) ) ) | Filed: August 3, 2023 |
| Petitioners. | ) ) ) | |

OWENS, J. —Eminent domain principles apply when a governmental entity takes or damages private property for public use. If a taking occurs without the formal exercise of eminent domain, a landowner may file an inverse condemnation claim to recover the loss of property value. The right to inverse condemnation belongs to the property owner at the time of the taking; the right does not pass to a subsequent purchaser unless expressly conveyed.

In 1993, respondents Brock and Diane Maslonka purchased land bordering the Pend Oreille River. The Pend Oreille Public Utility District (PUD) constructed a dam

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

on the river in 1955. The PUD operates the dam, raising and lowering the water levels based on seasonal flow. The previous owners informed the Maslonkas that the land occasionally floods.

In 2016, the Maslonkas sued the PUD, alleging its operation of the dam entitled them to damages based on inverse condemnation, trespass, nuisance, and negligence. The trial court found the subsequent purchaser rule barred the inverse condemnation claim, and that the PUD established a prescriptive easement barring the trespass and nuisance claims. The Court of Appeals reversed, holding that the PUD could not benefit from the subsequent purchaser rule because it failed to prove its conduct constituted a taking *prior* to the Maslonkas' purchase. The Court of Appeals also rejected the PUD's alternative argument that the Maslonkas could not bring their tort claims alongside their inverse condemnation claim.

This case asks us to decide who bears the burden of proving whether the "subsequent purchaser rule" applies; in other words, whether the rule is a doctrine of standing or an affirmative defense. Also at issue is whether an inverse condemnation claimant who is barred by the subsequent purchaser rule may nonetheless pursue tort claims based on the same alleged governmental conduct.

We hold that an inverse condemnation claimant must show that the subsequent purchaser rule *does not* bar their suit. It is a doctrine of standing in that it limits who may bring a claim; it is not a defense that must be proved by the government. We

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

also hold that an inverse condemnation claimant who is barred from suit by the subsequent purchaser rule has no viable tort claim if the tort is based on the same governmental conduct. Accordingly, we reverse the Court of Appeals and remand for the trial court to reinstate its summary judgment orders.

FACTS

*Box Canyon Hydroelectric Project*

The Box Canyon Hydroelectric Project is a run-of-river[1] facility located on the Pend Oreille River in northeastern Washington. Clerk's Papers (CP) at 74. The Box Canyon Dam was built in 1955 to generate low-cost electricity for customers and is owned and operated by the PUD. *Id.* The dam's turbine and spillway gates control the water surface elevation of the river. *Id.* at 75. The level of the gates affects the backwater, which is the difference in surface elevation between the natural water (without the dam) and the raised water (caused by the dam). *Id.* Generally, the PUD raises the gates when the river flowrate increases and lowers the gates when the flowrate decreases. *Id.* Before the dam was constructed, the natural high-water elevation at the Cusick Gage[2] was 2,028.0 feet above sea level, *id.* at 12; it is now 2,030.6 feet above sea level, *id.* at 75.

---

[1] A run-of-river facility's ability to generate electricity is subject to seasonal variations in river flow. Clerk's Papers at 108.

[2] The PUD adjusts the dam's gates based on the water levels at the Cusick Gage. CP at 78. The gage is roughly the same elevation as the Maslonkas' property, thus, the elevations in this opinion refer to those measured at the Cusick Gage. *Id.* at 485.

3

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

The PUD operates the dam within the constraints of its Federal Energy Regulatory Commission (FERC) license. *Id.* at 74. As they now stand, the first constraint requires that the water surface level at the Cusick Gage not exceed elevation 2,041 feet. *Id.* at 75. The second requires that the backwater below Albeni Falls Dam (which regulates the upstream flow to the dam) not exceed 2 feet above natural levels. *Id.* The third requires the drawdown not to exceed three 3 per hour. *Id.* at 99, 203. To comply with its operational parameters, the PUD monitors the river's elevation and adjusts the gates on a daily and sometimes hourly basis. *Id.* at 1630-32.

The dam's FERC license has been amended several times since its issuance. A 1963 amendment allowed 2 feet rather than 1 foot of backwater at Albeni Falls Dam. *Id.* at 78-79. A 1999 amendment, which incorporated a settlement between the PUD and the Kalispel Tribe, "include[d] in the project boundary the full extent of the lands inundated by the project reservoir" up to elevation 2,041 feet. *Id.* at 199-200, 654-61, 666-69. The "lands inundated" include the Maslonkas' property up to elevation 2,041 feet. *Id.* at 205. The order approving the amendment recognizes that under the proposed changes, "*the project would continue operating as it has* under the 1963 license amendment." *Id.* at 669. In expanding the project boundary, FERC acknowledged that a denial of the amendment "would likely force the PUD to change project operations so that waters from the Box Canyon reservoir did not rise above

4

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

elevation 2028 [feet] at Cusick, except at times when water would be that high naturally." *Id.* at 670. A 2005 amendment imposed the drawdown rate of 3 inches per hour, which requires the spillway gates to be raised or lowered gradually. *Id.* at 99, 203.

In addition to the license amendments, the PUD updated its equipment and gate hoists in 2015. *Id.* at 102. "Neither of these projects, separately or combined, has changed how the Box Canyon Project affects water levels in the Pend Oreille River." *Id.*

*The Maslonkas' property*

In July 1993, the Maslonkas bought 535 acres of pastureland bordering the Pend Oreille River from Herbert and Evelyn Cordes. *Id.* at 127, 420. The property is upstream of the Box Canyon Dam and downstream of Albeni Falls Dam. *Id.* at 486. Prior to the sale, Cordes and the Maslonkas discussed the flood hazards on the property. *Id.* at 880-81. Specifically, Cordes informed them that the lower part of the river flooded periodically, in "abnormally wet years or high water years." *Id.* at 153-55, 159-60.

When the dam was constructed, the Maslonkas' predecessors in interest (J. Lester and Florine Sullivan) sold express easements to the PUD. *Id.* at 328-33. The easements, recorded in 1955 and 1960, allow the PUD to "intermittently or continuously overflow, flood and submerge, or to damage by wash, erosion,

sloughage, seepage, inundation, or other cause," the land with water from the river "in the construction, operation and maintenance" of the dam. *Id.* at 328. The easements cover the majority of the flooding caused by the river and dam up to elevation 2,041.0 feet. *Id.* at 1412. When the river's flow rate exceeds 90,000 cubic feet per second, which occurs seasonally due to snow melt, the PUD lifts all the gates and the river floods above elevation 2,041.0 feet as if there were no dam in place. *Id.* at 75-76, 116. When this happens, the river's elevation surpasses the PUD's express easements. Verbatim Tr. of Proc. (VTP) (July 16, 2019) at 60; CP at 75-76, 1235. Since 1955, the river has flooded above elevation 2,035.5 feet about 12 percent of the year. CP at 75-80. The flooding erodes the shoreline and causes related property damage; these damages form the basis of these proceedings.

*Procedure*

In December 2016, the Maslonkas filed a complaint against the PUD for (1) governmental taking, (2) statutory trespass, (3) nuisance, and (4) negligence. *Id.* at 1-9. They sought damages, injunctive relief, and attorney fees. *Id.*

The PUD counterclaimed to quiet title to a prescriptive easement. *Id.* at 30-31. The PUD alleged it had continuously used the Maslonkas' property above elevation 2,035.5 feet since it began operating the dam in 1955, and the Maslonkas and their predecessors in interest knew this but failed to timely assert or enforce any right they may have had. *Id.*

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

The parties engaged in extensive discovery. The Maslonkas' expert witness, Vince Barthels, opined that the shoreline is actively being eroded above the PUD's express easement elevation of 2,035.5 feet. *Id.* at 489. Barthels estimated that the dam increases the river's elevation by 6.0 to 8.0 feet near the Maslonkas' property, "thereby regularly creating inundation and waves above the elevation of 2035.5 [feet]" and eroding the shoreline. *Id.* at 485, 489.

Lawrence Cordes, a former diking commissioner, testified that the area's flooding problems began around 2011 or 2012. *Id.* at 573-74. He stated that the river did not back up into the valley until the dam's operators changed. *Id.* Brock Maslonka testified that although he has no records of the flooding, he believes the PUD began backing up the water to elevation 2,041 feet in 1999. *Id.* at 880-83.

The PUD rebutted the Maslonkas' erosion assessment with two expert witnesses. One expert "strongly disagree[d]" with Barthels' estimate that the dam raises the water by 6.0 to 8.0 feet on the Maslonkas' property, opining instead that the water rises by 2.5 feet above natural levels. *Id.* at 106. The expert noted that Barthels visited just months after unusually high flooding in 2018, which the expert believed caused the recent erosion between elevations 2,035.5 feet and 2,038.0 feet and would have occurred regardless of the dam. *Id.*

The PUD moved for partial summary judgment, arguing among other things that the subsequent purchaser rule barred Maslonkas' inverse condemnation, nuisance,

7

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

and trespass claims. *Id.* at 54-61. The Maslonkas responded with their own evidence tending to show the flooding resulted in a $288,500 diminution in property value. *Id.* at 418-51, 703.

After hearing arguments, the trial court later issued a lengthy oral ruling. Noting that an inverse condemnation claim is actionable only by the property owner at the time of the taking, the court ruled:

> [W]e have all of the agreements about the flooding of the property. Mr. Maslonka had conversations with the prior owner about the flooding so the flooding problems were evident at the time of purchase. County records contained notice of the land[']s propensity to flood. The purchase either did or should have reflected the diminished value of the land caused by its propensity to flood.
>
> And so the Maslonkas—did not acquire the property until after the alleged inverse condemnation was complete. So that would have happened with the original—property owners, the Sullivans, and there is no evidence that they conveyed the right to an inverse condemnation claim to the subsequent purchaser . . . from that point, forward.
>
> So,—as a matter of law the Maslonkas' inverse condemnation claim is foreclosed by the subsequent purchaser doctrine.

VTP (July 16, 2019) at 61-62.

The court clarified that the Maslonkas vaguely asserted a new taking, but it found no evidence in support: "[T]he dam has operated consistently within its legal parameters. There's been no change." *Id.* at 62.

8

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

The court then denied summary judgment on the trespass and nuisance claims, finding a genuine question of fact as to whether they are continuing or permanent. *Id.* at 62-63. The trial court incorporated its oral ruling in an order. CP at 824-27.

The PUD later moved for summary dismissal of the trespass and nuisance claims on the grounds that it established a prescriptive easement up to elevation 2,041 feet. *Id.* at 834-56. The trial court granted the motion. *Id.* at 1881-82.

Both parties appealed. Division Three of the Court of Appeals reversed the dismissal of the inverse condemnation, trespass, and nuisance claims.[3] *Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*, 23 Wn. App. 2d 1, 56, 514 P.3d 203 (2022). It held that the trial court erred in determining the subsequent purchaser rule barred the inverse condemnation claim, *id.* at 47-49, and that that claim did not subsume the Maslonkas' alternative theory of recovery in tort, *id.* at 50-51.

We granted review on the subsequent purchaser rule and tort issues. *Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*, 200 Wn.2d 1016 (2022). The Washington Public Utility Districts Association and the Washington State Department of Transportation filed amici curiae briefs in support of the PUD.

---

[3] The Court of Appeals opinion focused largely on the PUD's prescriptive easement claim. Neither party raised that issue to this court.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

ISSUES

1. Does the subsequent purchaser rule bar the Maslonkas' inverse condemnation claim?

2. Are the Maslonkas' tort claims incompatible with their inverse condemnation claim?

ANALYSIS

*Standard of Review*

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). We review summary judgment orders de novo, engaging in the same inquiry as the trial court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Owen v. Burlington N. & Santa Fe R.R. Co.*, 153 Wn.2d 780, 787, 108 P.3d 1220 (2005). Mere speculation cannot defeat a summary judgment motion. *White v. State*, 131 Wn.2d 1, 9, 929 P.2d 396 (1997).

1. The subsequent purchaser rule bars the Maslonkas' inverse condemnation claim

A. Background on eminent domain and inverse condemnation

Under constitutional eminent domain principles, the government cannot take or damage private property for public use without just compensation. WASH. CONST. art. I, § 16. An inverse condemnation action seeks to recover the value of property affected by a governmental taking or damaging that occurred without a formal

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

exercise of the power of eminent domain. *Dickgieser v. State*, 153 Wn.2d 530, 534-35, 105 P.3d 26 (2005) (citing *Phillips v. King County*, 136 Wn.2d 946, 957, 968 P.2d 871 (1998)). To prevail, an inverse condemnation claimant must show there has been "(1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings." *Fitzpatrick v. Okanogan County*, 169 Wn.2d 598, 605-06, 238 P.3d 1129 (2010).

Not all landowners can recover for damages caused by governmental conduct through an inverse condemnation action. The subsequent purchaser rule prohibits landowners from suing for property damage caused by governmental conduct that occurred prior to their ownership. *See Hoover v. Pierce County*, 79 Wn. App. 427, 433-34, 903 P.2d 464 (1995) (citing 30 C.J.S. *Eminent Domain* § 390, at 461 (1965)); *see also* 29A C.J.S. *Eminent Domain* § 383, at 757 (1992) ("'[W]here property is taken or injured under the exercise of the power of eminent domain, the owner thereof at the time of the taking or injury is the proper person to initiate proceedings or sue therefor.'"). "Because the right to damages for an injury to property is a *personal right* belonging to the property owner, *the right does not pass to a subsequent purchaser* unless expressly conveyed." *Hoover*, 79 Wn. App. at 433-34 (emphasis added); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 628, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001) ("[I]t is a general rule of the law of eminent domain that any

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

award goes to the owner at the time of the taking, and that the right to compensation is not passed to a subsequent purchaser."). No damages should be awarded to plaintiffs who acquired property for a price commensurate with its diminished value. *Hoover*, 79 Wn. App. at 434.

> B. The subsequent purchaser rule is a doctrine of standing and not an affirmative defense

In reversing the trial court's inverse condemnation ruling, the Court of Appeals reasoned that "the subsequent purchaser rule is a defense," so the PUD must prove that it permanently reduced the value of the property before the Maslonkas' purchase. *Maslonka*, 23 Wn. App. 2d at 48. It held that the PUD failed to carry this burden, bringing only nonspecific evidence that the Maslonkas knew the property flooded periodically up to the recorded easement limit. Thus, the court found a genuine issue of material fact precluded the application of the subsequent purchaser rule on summary judgment.

The PUD and amici curiae argue the subsequent purchaser rule is not a defense and is instead a doctrine of standing. We agree. Standing requires a party to have a real interest in the litigation and generally prohibits a litigant from asserting the legal rights of another. *Dean v. Lehman*, 143 Wn.2d 12, 18-19, 18 P.3d 523 (2001). As a threshold matter, the *plaintiff* must clearly demonstrate that they are the proper party to invoke judicial resolution of the dispute. *Warth v. Seldin*, 422 U.S. 490, 518, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). If a plaintiff lacks standing, the court need not

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

hear the case. *See Branson v. Port of Seattle*, 152 Wn.2d 862, 875 n.6, 101 P.3d 67

(2004). Although our case law does not expressly characterize the subsequent

purchaser rule as one of standing,[4] it limits who may sue for inverse condemnation by

prohibiting a subsequent purchaser from asserting the legal rights of the owner at the

time of the alleged taking.

This conclusion is consistent with other jurisdictions that recognize the

subsequent purchaser rule as a doctrine of standing rather than as an affirmative

defense. *See, e.g.*, *Russell Real Prop. Servs., LLC v. State*, 200 So. 3d 426, 429-30

(Miss. 2016) (plaintiff lacked standing to pursue inverse condemnation claim based on

actions predating ownership of the property); *State ex rel. City of Blue Springs v.*

*Nixon*, 250 S.W.3d 365, 370 (Mo. 2008) ("[T]he cause of action for inverse

condemnation vested in the prior owners. As subsequent grantees, the [plaintiffs]

would not have standing to bring a claim for inverse condemnation." (citation

omitted)); *Johns v. Black Hills Power, Inc.*, 722 N.W.2d 554, 558 (S.D. 2006)

(because the challenged conduct occurred prior to the plaintiffs' purchase, "any cause

of action for inverse condemnation belongs to the prior owner and [the plaintiffs] lack

---

[4] One unpublished opinion has categorized the rule as a standing issue. *See City of*
*Woodinville v. Fowler P'ship*, No. 72417-7-I, slip. op. at 8 n.3 (Wash. Ct. App. Aug. 24,
2015) (unpublished) (plaintiff "lacks standing to challenge the taking now, because of the
subsequent purchaser rule"), https://www.courts.wa.gov/opinions/pdf/724177.pdf.
Unpublished cases have no precedential value. GR 14.1. The *Hoover* court
acknowledged the argument that subsequent purchasers lack standing to sue but did not
include that language in its holding. *See Hoover*, 79 Wn. App. at 433, 436.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

standing to maintain an action for the taking"); *Knight v. City of Billings*, 197 Mont. 165, 176, 642 P.2d 141, 147 (1982) (the right to a remedy does not pass to subsequent purchaser after the inverse condemnation occurred). The Maslonkas cite no case that categorizes the subsequent purchaser rule as an affirmative defense.

The Maslonkas are correct that standing refers to a party's right to bring a legal claim and is not intended to be a "high bar" to overcome. Yet they overlook that the subsequent purchase rule governs a party's right to bring a legal claim. That is, it limits the right of a subsequent purchaser from bringing an inverse condemnation claim unless such a right was properly conveyed. It is not necessarily a high bar to overcome; it simply requires the proper plaintiffs to bring suit.

The Court of Appeals opinion essentially flips the standing burden by requiring the PUD to show that Maslonkas *lacked* standing. It held that the PUD failed to show that it permanently reduced the property value before the Maslonkas acquired it, therefore it could not benefit from the subsequent purchaser rule. However, the rule is a doctrine of standing, which the plaintiff must establish.

     C. Under this holding, the Maslonkas cannot bring an inverse condemnation claim

        i. The Maslonkas are subsequent purchasers

The taking occurred when the dam was built in 1955; thus, the proper inverse condemnation claimants were the Sullivans, who owned the land at that time. The Maslonkas bought the land in 1993. Implicit in the subsequent purchaser rule is the

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

principle that the purchase price of land subject to a governmental taking reflects the diminution of value. The PUD's dam operations have flooded the property since 1955, and we assume the Maslonkas' purchase price reflected this known seasonal flooding. As subsequent purchasers, the Maslonkas have no inverse condemnation claim unless they establish a new taking occurred after 1993.

ii.    The Maslonkas failed to establish new taking

To avoid dismissal of their inverse condemnation claim under the subsequent purchaser rule, the Maslonkas must prove a new governmental action or taking occurred after their purchase. *See Hoover*, 79 Wn. App. at 434. A new taking occurs when additional governmental action causes a measurable decline in market value of the property. *Id.* at 434-35. However, when a governmental action causes known flooding prior to a plaintiff's acquisition, a new cause of action does not arise with each flood absent additional governmental action. *Id.* at 435-36.

The Court of Appeals implied there are disputed facts as to whether there has been a new taking: "PUD has received significant license amendments at least twice since the Maslonkas purchased the property. It is not inconceivable to think that the PUD altered or expanded its operations as a result of those amendments in such a way as to cause new damage to the Maslonkas' property." *Maslonka*, 23 Wn. App. 2d at 49. The record does not support this conclusion, and summary judgment cannot be defeated by relying on speculation.

15

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

Brock Maslonka surmised that flooding increased in 1999; Cordes thought it increased in 2011 or 2012. Neither deponent supported these statements, and the PUD's evidence firmly rebuts this testimony. *See* CP at 199-200 (1999 amendment included lands *already being flooded* up to elevation 2,041 feet), 102-03 (2015 amendments had no effect on river elevation). The Maslonkas produced no evidence that the dam's *operations* changed after 1993 to increase flooding; any increase cannot be, on this record, attributed to the PUD. Without evidence of a new taking, the Maslonkas' inverse condemnation claim cannot survive summary judgment.

The Maslonkas attempt to distinguish *Hoover* and cases involving "fixed and unmovable construction projects" completed before the property was acquired from the PUD's continued "discretionary operation" of the dam. Maslonkas' Answer to Amicus Curiae Brs. at 14 (emphasis omitted). It is difficult to understand how the dam is not a fixed and unmovable construction project, notwithstanding the fact that the gates are adjustable. Over a century ago, the United States Supreme Court held, "There is no difference of kind, but only of degree, between a permanent condition of continual overflow by back-water and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other." *United States v. Cress*, 243 U.S. 316, 328, 37 S. Ct. 380, 61 L. Ed. 746 (1917). The dam is, in the words of *Cress*, "a permanent liability to intermittent but inevitably recurring overflows." *Id.*

16

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

The trial court properly dismissed the Maslonkas' inverse condemnation claim based on the subsequent purchaser rule and their failure to bring evidence of a new taking. Accordingly, we reverse the Court of Appeals on this issue and remand with instructions for the trial court to reinstate its summary judgment order.

2. The Maslonkas' tort claims are incompatible with their inverse condemnation claim

Generally, when the government takes private property from an individual for public use, eminent domain principles apply. *Highline Sch. Dist. No. 401 v. Port of Seattle,* 87 Wn.2d 6, 17, 548 P.2d 1085 (1976). We have long distinguished takings claims from tort claims. *Wong Kee Jun v. City of Seattle*, 143 Wash. 479, 255 P. 645 (1927).

The Court of Appeals held that inverse condemnation claims do not foreclose tort recovery, pointing out that the cited cases merely held that viable inverse condemnation claims *mooted* tort recovery. *Maslonka*, 23 Wn. App. 2d at 50-51. It is true that tort actions are unnecessary where the defendant is a governmental entity and "'the recovery sought is only for loss of property rights, not personal or other injuries.'" *Id.* (quoting *Highline*, 87 Wn.2d at 17). Indeed, this court has explained:

> In circumstances where the inverse condemnation theory is available, potential plaintiffs are not disadvantaged if they are denied recourse to a nuisance cause of action. Of course, where a plaintiff seeks to recover damages for other than loss of property rights or where the defendant is not an entity to which eminent domain principles apply, the nuisance remedy is still available.

17

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

*Highline*, 87 Wn.2d at 17-18 (footnote omitted).

The parties agree that a taking has occurred. Thus, notwithstanding our holding above, an inverse condemnation theory is *available* to the Maslonkas. They sought damages for loss of property rights (a taking) against a defendant to which eminent principles apply (the PUD). The Maslonkas simply could not show the taking occurred *after their purchase*. Under these facts and *Highline*, the Maslonkas are not disadvantaged if they are denied recourse to a nuisance cause of action.

The Maslonkas point to several cases[5] to support their position that tort actions are not necessarily subsumed by inverse condemnation claims. *See Dickgieser*, 153 Wn.2d 530; *Olson v. King County*, 71 Wn.2d 279, 284-85, 428 P.2d 562 (1967); *Eggleston v. Pierce County*, 148 Wn.2d 760, 64 P.3d 618 (2003). These cases are not on point.

In *Dickgieser*, we rejected the argument that the plaintiffs' inverse condemnation claim was based on mere negligence and held that factual disputes remained as to whether the conduct was reasonably necessary for the public use. 153

---

[5] The Maslonkas and the Court of Appeals cite *Pac. Hwy. Park v. Dep't of Transp.*, No. 44198-5-II, slip op. at 10-11 (Wash. Ct. App. June 3, 2014) (unpublished), https://courts.wa.gov/opinions/pdf/D2%2044198-5-II%20Unpublished%20Opinion.pdf where Division Two rejected an argument that inverse condemnation claims subsume tort claims. There, like here, the subsequent purchaser rule barred the inverse condemnation claim; it therefore could not subsume any tort claims. Moreover, unpublished cases lack precedential value. GR 14.1.

18

Wn.2d at 541. We did not discuss whether a tort claim could be a viable alternate theory of recovery to an inverse condemnation claim.

In *Olson*, we explained that "[e]very trespass upon, or tortious damaging of real property does not become a constitutional taking or damaging simply because the trespasser or tort-feasor is the [government]." 71 Wn.2d at 284. But there, the damage was a "'mere temporary interference with a private property right'" that "'might have been avoided by due care'" which did not rise to the level of a taking. *Id.* at 285 (quoting *Wong Kee Jun,* 143 Wash. at 505. Here, the parties do not dispute that the flooding rises to the level of a taking; it is the subsequent purchaser rule that precludes the Maslonkas from pursuing their inverse condemnation action. *Olson* does not stand for the proposition that a plaintiff whose claims are barred by subsequent purchaser rule gets to file a negligence suit instead.

*Eggleston* arose from a criminal investigation in which the execution of a search warrant rendered the plaintiff's house uninhabitable. 148 Wn.2d at 764-66. The plaintiff alleged the damages from the police activity amounted to a taking. *Id.* at 766. We held that although the loss may have been compensable under a variety of legal theories, it was not a cognizable taking and was instead incidental to the State's exercise of its police powers. *Id.* at 766-67, 768-76. *Eggleston* does not suggest that a tort claim can be brought as an alternative theory of recovery to an inverse condemnation claim.

19

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

The Court of Appeals noted that *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 296 P.3d 860 (2013), addressed the merits of tort claims alongside inverse condemnation claims. But *Lakey* considered claims based on different actions by different defendants. We considered a nuisance claim against an energy company for operating a substation alongside an inverse condemnation claim against a city for issuing the substation permit. *Id.* at 921-31. In other words, the tort claim was against a private company while the condemnation claim was against the government. The tort claim was not a "backup" theory of recovery if the takings claim was barred by the subsequent purchaser rule. And unlike the plaintiffs in *Lakey*, the Maslonkas named the PUD as both the tort defendant and the inverse condemnation defendant.

In sum, there is no authority that inverse condemnation claimants barred by the subsequent purchaser rule are entitled to alternative tort recovery. There may be a case where a plaintiff may pursue tort recovery when the governmental action does not rise to a taking, but that is not the case here. Indeed, the parties do not dispute that a taking occurred. The Maslonkas allege one governmental action—the continuous flooding caused by the dam's construction in 1955—as the basis for both their tort and inverse condemnation claims. If tort claims exist as a backup theory of recovery for otherwise barred inverse condemnation claims, subsequent purchasers could endlessly sue governmental entities in tort. The Maslonkas should not be permitted to proceed in tort if they cannot prove inverse condemnation as subsequent purchasers. In other

20

words, they cannot maintain a tort action for conduct that undisputedly constitutes a taking. We therefore reverse and remand to reinstate the trial court's dismissal of the trespass and nuisance claims.

## CONCLUSION

We hold that the subsequent purchaser rule is a doctrine of standing, requiring the Maslonkas to prove they are the proper plaintiffs to bring their inverse condemnation claim. The Maslonkas failed to do so and did not proffer evidence of a new taking to survive summary judgment. We therefore reverse the Court of Appeals on this issue and remand to reinstate the trial court's summary judgment order.

We also hold that where the subsequent purchaser rule bars their underlying takings claim, the Maslonkas cannot sue the PUD in tort for the same underlying conduct. Accordingly, we reverse the Court of Appeals' holding on this issue and remand to reinstate the trial court's dismissal of the Maslonkas' trespass and nuisance claims.

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*
No. 101241-1

_____
Owens, J.

WE CONCUR:

_____
González, C.J.

_____
Johnson, J.

_____
Madsen, J.

_____
Stephens, J.

_____
Gordon McCloud, J.

_____
Yu, J.

_____
Montoya-Lewis, J.

_____
Leach, J.P.T.

22